## 24 LEGGETT STREET LIMITED PARTNERSHIP *v.* BEACON INDUSTRIES, INC.
### (15472)

Borden, Norcott, Katz, Palmer and McDonald, Js.

Argued October 3—officially released November 26, 1996

*Thomas W. Witherington*, for the appellant-appellee (plaintiff).

*Carole W. Briggs*, with whom was *Dana Shaw MacKinnon*, for the appellee-appellant (defendant).

KATZ, J. This appeal arises from an action brought by the plaintiff, 24 Leggett Street Limited Partnership, against the defendant, Beacon Industries, Inc., to recover damages for the alleged environmental contamination of real property purchased by the plaintiff from the defendant. The plaintiff appeals from the judgment of the trial court, claiming that the trial court improperly: (1) failed to include in the plaintiff's damages for breach of the purchase and sale agreement (agreement) the full cost to excavate and remove certain environmental contamination, including certain estimated

future costs for cleanup; (2) found in favor of the defendant on the fraudulent misrepresentation and negligent misrepresentation counts; (3) failed to award the plaintiff attorney's fees and costs associated with this litigation in accordance with the agreement; and (4) considered the defendant's claim that the expiration of the five year indemnity period set forth in the agreement barred certain of the plaintiff's claimed damages when the defendant failed to raise the issue of timeliness as a special defense. In its cross appeal, the defendant claims that the trial court improperly: (1) concluded that the defendant was liable for excavation of metal shavings and other nonhazardous materials that took place between November 11 and November 15, 1988; and (2) found the defendant liable for costs associated with the 1988 remediation for which the defendant was not responsible. We transferred the appeal and cross appeal from the Appellate Court to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We agree with the plaintiff that it was entitled to its full contractual damages, including attorney's fees and costs, and, therefore, we affirm in part and reverse in part.

The following facts are not disputed. From 1945 to 1987, the defendant owned and operated a manufacturing facility producing jet engine components on property located at 24 Leggett Street in East Hartford.[1] In the manufacture of these components, the defendant used a process known as "turning," through which metal strips were shaved off to form precision parts. Because the process generated a substantial amount of heat, a water soluble solution, consisting of oils or lubricants, was applied to the metal parts to reduce the heat. The defendant also used various other hydraulic

---

[1] Although the defendant completed moving its manufacturing operations to a facility in Bloomfield by June, 1987, the defendant continued to own the Leggett Street property until the sale to the plaintiff in 1988.

oils for lubrication in the manufacturing process. The defendant generated several thousand pounds of metal turnings each month and stored the scrap metal shavings in open barrels on site pending disposal.

On January 12, 1988, the plaintiff purchased the property from the defendant. During the course of extensive negotiations lasting four to five months prior to the closing, the plaintiff advised the defendant that the purchase was contingent on the plaintiff receiving certain assurances from the defendant regarding the environmental condition of the property. On October 20, 1987, the defendant provided the plaintiff with a copy of an environmental site assessment report dated July 8, 1987 (1987 report). The 1987 report had been prepared by HRP Associates, Inc. (HRP), for Harper Surface Finishing Systems, a company that had earlier expressed interest in the property.[2] HRP had not investigated subsurface conditions at the site, and thus no subsurface soil contamination was disclosed in the 1987 report.

In paragraph 15 (k) of the agreement executed by the parties, the defendant warranted: "Except as may be indicated in a certain Site Assessment Report for the Property, prepared by HRP Associates, Inc., and issued on July 8, 1987 . . . no 'Hazardous Waste' . . . and/or 'Spill' . . . and/or 'Hazardous Substance' . . . and/or other environmental contamination now exists, or has ever been stored, on the Premises . . . ."[3] Para-

[2] Based upon a site inspection and background search, the 1987 report recommended that: (1) the 107 waste barrels located in the fenced parking lot be sampled to determine the contents and be disposed of properly; (2) five of the seven transformers be checked for the possible presence of PCBs; (3) four soil-stained areas be surface sampled for contaminants; (4) the thirty-five year old underground oil storage tank be removed and the soil sampled; and (5) monitoring wells be installed in four areas.

[3] Paragraph 15 provides in relevant part: "The Seller represents and warrants . . . (k) Except as may be indicated in a certain Site Assessment Report for the Property, prepared by HRP Associates, Inc. and issued on

graph 15 (k) further provided that the defendant would defend, indemnify and hold the plaintiff harmless "from and against any liabilities, losses, damages, costs or expenses (including reasonable attorneys' fees) of any nature arising from the environmental condition of or problem with the Property, which condition or problem arose prior to Closing and whether known by Purchaser (by virtue of the Site Assessment Report) or unknown." Additionally, paragraph 15 (k) provided that the indemnity provision would survive the closing for a period of five years.

In September, 1988, the plaintiff discovered a depression in the asphalt in an area within the fenced portion of the property's parking lot. A contractor assisting in renovation work on the property dug up the asphalt, exposing discolored soil, metal shavings and the stench

July 8, 1987 (the 'Site Assessment Report'), a copy of which is attached hereto as Schedule G, no 'Hazardous Waste' (as such term is defined in Connecticut General Statutes Section 22a-115 or 22a-448, as amended) and/ or 'Spill' (as such term is defined in Connecticut Public Act 85-443, Section 1, as amended) and/or 'Hazardous Substance' (as such term is defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. [§ 9601] et seq. and in any applicable Connecticut Statutes and Regulations) and/or other environmental contamination now exists, or has ever been stored, on the Premises, or on the following ('Adjoining Property'): any real estate that, within the three (3) year period preceding Closing, either (i) has been included in the property description of the Premises, or (ii) has included the Premises in the property description of such real estate. Seller shall defend, indemnify and hold Purchaser harmless from and against any liabilities, losses, damages, costs or expenses (including reasonable attorneys' fees) of any nature arising from the environmental condition of or problem with the Property, which condition or problem arose prior to Closing and whether known by Purchaser (by virtue of the Site Assessment Report) or unknown. The indemnity set forth in this Subparagraph K shall survive the Closing for a period of five (5) years only and shall not merge in the Deed to be delivered by Seller. In the event a final judgment is rendered with respect to an action brought with respect to this Subparagraph (k) and it is determined that the environmental condition or problem arose subsequent to the Closing, Purchaser shall reimburse Seller for all reasonable costs, including its reasonable attorneys' fees incurred as a result of said action. . . ."

of oil. The plaintiff retained HRP to conduct soil testing, which revealed the presence of toluene and xylene, with xylene at levels substantially higher than the state action level established by the state department of environmental protection (department).[4] Based on these results, HRP recommended removal of the contaminated soil, and HRP subsequently obtained approval from the department for the plaintiff to dispose of 1000 cubic yards of the soil.

On November 8, 1988, HRP conducted additional excavation, which revealed metal shavings, soil discoloration and a hydrocarbon odor. Testing of soil samples taken from this excavation showed xylene above the state action level and the presence of an unknown hydrocarbon mix.[5] On November 11, 1988, HRP collected more soil samples for testing. At the time of the tests and prior to receiving any results on the samples taken on November 11, HRP observed metal shavings, a ten inch band of discolored soil and a hydrocarbon odor. As a result of these findings, HRP directed the excavation of an additional 370 cubic yards of soil. On November 15, 1988, the test results of the November 11 samples were received and revealed no compounds that exceeded the state action level.[6] Further activity was then halted.

On February 2, 1989, the plaintiff forwarded an invoice to the defendant totaling $59,668.17 for remedia-

[1] Tests revealed the presence of P and M-xylene at 817 parts per billion and O-xylene at 1126 parts per billion, both well in excess of the state action level of 100 parts per billion.

[5] One sample reflected P and M-xylene at 182 parts per billion and O-xylene at 794 parts per billion, both above the state action level. Another sample showed O-xylene present at 69 parts per billion.

[6] Although the test results indicated no compounds in the 8010 or 8020 scan exceeding the state action level, HRP did not at this time test for total petroleum hydrocarbon content. Rather, HRP was concerned about halogenated and aromatic hydrocarbons caused by industrial solvents, and the 8010 and 8020 scans could detect their presence.

tion costs and the estimated costs of repaving the excavated area. The defendant denied responsibility for any costs associated with the excavation after November 11, 1988, on the ground that the November 15 test results indicated that further excavation was unnecessary.[7] At a meeting on April 17, 1989, the defendant advised the plaintiff that it would pay only $38,139.07, which represented the remediation costs through November 11, 1988. The defendant subsequently tendered a check in that amount, which the plaintiff deposited.

In August, 1989, the plaintiff remained concerned about further soil contamination on the property and engaged HRP to test other locations at the site. HRP installed thirteen test pits throughout the property and drilled four groundwater monitoring wells in addition to the five existing wells. According to HRP's November, 1990 report,[8] testing on the soil and groundwater samples revealed no contaminants that exceeded state action levels. HRP found, however, that metal shavings were present in one test area, test pit 1A and detected a hydrocarbon odor in material collected from another test area, test pit 3A. Concluding that the metal shavings constituted "special wastes" pursuant to § 22a-209-1 of the Regulations of Connecticut State Agencies,[9] HRP recommended that "this material be removed or that

---

[7] Additionally, the defendant disputed the hours necessary for the use of certain construction equipment as well as the area to be repaved.

[8] In order to correct certain inaccuracies in the original report released in November, 1989, HRP issued a revised report in November, 1990.

[9] At the time of the actions involved in this case, § 22a-209-1 of the Regulations of Connecticut State Agencies defined "special wastes" as "non-hazardous solid wastes which require special handling, as specified in these regulations, either more or less restrictive than the requirements imposed on a solid waste disposal area. The term includes the following: (1) non-hazardous water-treatment, sewage treatment or industrial sludges, liquids, solids or contained gases; fly-ash and casting sands or slag; and contaminated dredge spoils; (2) scrap tires; (3) bulky waste, as defined in these regulations; and (4) asbestos." This regulation was subsequently revised in 1990 by adding language not relevant to this opinion.

the [department] Water Compliance and Solid Waste Units approve of this site as a closed special waste disposal area which does not require any post closure activities." In light of the relatively small area and the extensive engineering and legal fees necessary to obtain such a permit, HRP advised the plaintiff to continue excavation in the vicinity of test pit 1A. In November, 1990, HRP estimated the cost of the remedial measures associated with the removal of the soils containing metal shavings to be $81,500.[10] One year later, in November, 1991, HRP prepared a revised estimate of the remediation, which reflected a cost of $299,950.[11]

In July, 1991, within the five year indemnity period of paragraph 15 (k), the plaintiff commenced this action, alleging fraudulent misrepresentation (count one), negligent misrepresentation (count two), breach of warranty (count three) and breach of contract (count four).[12] In December, 1994, just prior to trial, HRP conducted additional testing in order to define more precisely the extent of the contamination remaining on the property. In a grid formation across the site, HRP installed fifty-three test borings and tested soil samples for hazardous waste metals and hydrocarbon odor. Additionally, four representative soil samples were tested for a number of parameters, including total petroleum hydrocarbon (TPH) content. HRP found that twenty-two of the twenty-seven test borings within the

[10] Because test pit 1A was contaminated, HRP estimated the area of soil to be removed by bisecting the distance to the surrounding uncontaminated test pits. The resulting estimate was 275 cubic yards of soil.

[11] The $299,950 estimate assumed excavation of the full distance from test pit 1A to the surrounding test pits. Walter Gancarz, vice president of HRP, testified: "[W]hen we had assumed halfway before, by going all the way now, basically, you increase the amount by almost four times. The initial estimate is probably on the optimistic side, and [this] estimate on the very conservative side."

[12] Three additional counts relating to the Connecticut Transfer Act, General Statutes § 22a-134, were withdrawn by the plaintiff at the time of trial.

fenced area contained metal shavings.[13] Moreover, five test borings in a small area west of, and outside, the fenced area contained metal shavings.[14] HRP also detected a hydrocarbon odor in six test borings, five inside the fenced area and one in the small testing area west of the fenced area.[15] Furthermore, three of the four representative samples tested revealed TPH content at levels substantially higher than the proposed department state action level.[16] Based on the December, 1994 soil boring survey, HRP estimated that 975 cubic yards of contaminated soil should be removed, at a cost of $254,300.[17] The plaintiff introduced these test results at trial as proof of damages.

After a seven day bench trial, the trial court rendered judgment in favor of the plaintiff on count three in the amount of $7863.95, but in favor of the defendant on the remaining counts. Specifically, the trial court held the defendant liable for the costs associated with the removal of 1370 cubic yards of contaminated soil prior to December, 1988. The trial court, however, refused to hold the defendant liable for costs associated with the remediation of the contamination as described in HRP's November, 1990 report and its revised 1991 estimate, reasoning that the report's assumptions and estimates, although made within the indemnity period,

---

[13] Specifically, metal shavings were detected in borings 1, 2, 3, 4, 6, 7, 8, 9, 11, 12 and 16 through 27.

[14] The contaminated borings in this area consisted of borings 38, 43, 49, 50 and 51.

[15] These included borings 3, 6, 10, 16, 23 and 38.

[16] Specifically, boring 3 revealed TPH content of 18,720 parts per million, boring 16 revealed TPH content of 2880 parts per million, and boring 23 revealed TPH content of 5300 parts per million. The proposed state action level is 200 parts per million.

[17] On the basis of the December, 1994 survey, HRP originally estimated the remediation cost to be $270,000, which included certain costs for processed stone and asphalt that would upgrade the pavement in the fenced area. The plaintiff conceded that it is not entitled to the upgrade and, thus, reduced the estimate by $15,700 to $254,300.

were merely speculative. Moreover, the trial court declined to award the plaintiff any damages for the contamination found in December, 1994, concluding that under paragraph 15 (k), the seller could only be liable for contamination actually discovered in the five year indemnity period.[18] This appeal and cross appeal followed. Additional facts will be provided as warranted.

## I

We first address the issues raised by the defendant on cross appeal because resolution of the defendant's claims eliminates certain substantial issues raised by the plaintiff and simplifies our analysis. We begin with the defendant's first claim on its cross appeal, namely, that the trial court improperly held the defendant liable for the remediation of material not covered by paragraph 15 (k) of the agreement. Specifically, the defendant argues that it cannot be held liable for any

[18] Specifically, the trial court found in relevant part: "The court holds that the defendant cannot be held responsible for any contamination made on the assumptions and estimates of HRP in its November, 1990 and 1991 reports. These assumptions and estimates based on limited data and without further testing were merely speculative.

"The court further holds that the defendant cannot be held responsible for any contamination which was discovered in December, 1994. The purchase and sale agreement specifically provides that the indemnity set forth therein shall survive the closing for a period of five years only. The court interprets this to mean that the seller can only be held responsible for contamination that was actually *discovered* within the five year period. While certain contamination was discovered within the five year period, 1370 cubic yards of that soil had been removed and the court finds that the defendant is liable for the costs of that removal. The amount of further contamination expected to be found (prior to the expiration of the five year indemnity period) was based on assumptions, estimates, and speculation, and the plaintiff failed to prove what the amount of that contamination was. The amount of additional contamination actually discovered in December, 1994, was discovered after the five year indemnity period had expired.

"The court holds that the defendant can only be responsible for the costs of remediation performed prior to December, 1988. . . ." (Emphasis in original.)

excavation that took place between November 11 and November 15 because the metal shavings present in the soil samples taken on November 11 were not covered by paragraph 15 (k), and there were no actionable levels of hazardous waste, hazardous substances or other environmental contamination present in the soil samples taken by HRP on November 11.

## A

The defendant first argues that the trial court mischaracterized the metal shavings[19] found at the site as "special waste,"[20] a contaminant covered by paragraph 15 (k), and, therefore, improperly determined that the defendant was liable for the costs associated with the excavation of the soil in which those shavings were found. Specifically, the defendant asserts that (1) special waste is not covered by paragraph 15 (k), and (2) even if special waste is covered by paragraph 15 (k), the metal shavings do not constitute special waste.[21] The plaintiff, in turn, argues that, regardless of whether the metal shavings constitute special waste, the shavings fit within the paragraph's provision for "other environmental contamination" because they are solid waste subject to regulation by the department.[22]

Our resolution of the defendant's claim is guided by the general principles governing the construction of contracts. A contract must be construed to effectuate

[19] The parties do not dispute the existence of the metal shavings. The only dispute is in regard to the characterization of those shavings.

[20] See footnote 9.

[21] The defendant's expert testified at trial that the metal shavings were not waste at all because the defendant recovered and recycled the shavings as part of its manufacturing program. The expert immediately contradicted his own testimony, however, by admitting that because they had been discarded, the shavings satisfied the definition of "waste." Finally, the defendant concedes in its reply brief that the metal shavings are a solid waste.

[22] General Statutes (Rev. to 1987) § 22a-207 (3) defines "solid waste" as "unwanted or discarded materials, including solid, liquid, semisolid or contained gaseous material."

the intent of the parties, which is "determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Absent a statutory warranty or definitive contract language, the trial court's interpretation of a contract, being a determination of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Tremaine* v. *Tremaine*, 235 Conn. 45, 57, 663 A.2d 387 (1995).

The trial court heard evidence that the metal shavings found in the November, 1988 excavation and the subsequent test pits constituted special waste. Although the court did not make a specific determination in its memorandum of decision as to the character of the shavings, implicit in its decision that the defendant breached the agreement is a finding that the shavings constituted, at the very least, an environmental contaminant covered by paragraph 15 (k). We conclude that the metal shavings constitute special waste as defined by the department and, even if not characterized as special waste, the metal shavings, as solid waste subject to regulation by the department, fall within the catchall category of

paragraph 15 (k) of "other environmental contamination."

Paragraph 15 (k) of the agreement warrants that, aside from that disclosed by the 1987 report, the site contains no hazardous waste, as defined by General Statutes (Rev. to 1987) § 22a-115 or General Statutes (Rev. to 1987) § 22a-448;[23] no hazardous substance, as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., and any applicable Connecticut regulations or statutes;[24] no spill, as defined by No. 85-443, § 1, of the 1985 Public Acts;[25] and no "other environmental contamination." The defendant argues

---

[23] General Statutes (Rev. to 1987) § 22a-115 (1) provides: " 'Hazardous waste' means any waste material, except by-product material, source material or special nuclear material, as defined in section 22a-151, which may pose a present or potential hazard to human health or the environment when improperly disposed of, treated, stored, transported, or otherwise managed, including (A) hazardous waste identified in accordance with Section 3001 of the Federal Resource Conservation and Recovery Act of 1976 (42 U.S.C. [§] 6901 et seq.), (B) hazardous waste identified by regulation by the department of environmental protection and (C) polychlorinated biphenyls in concentrations greater than fifty parts per million."

General Statutes (Rev. to 1987) § 22a-448 (3) provides: " 'Hazardous waste' means any waste material which may pose a present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of or otherwise managed including hazardous waste identified in accordance with Section 3001 of the Resource Conservation and Recovery Act of 1976 (42 U.S.C. [§] 6901 et seq.)."

[24] For purposes of 42 U.S.C. § 9601 et seq., hazardous substances are classified as either listed or unlisted. Listed hazardous substances appear in 40 C.F.R. § 302.4 (1988). Unlisted hazardous substances are those solid wastes, as defined by 40 C.F.R. § 261.2 (1988), which are not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4 (b) (1988) and which exhibit the characteristics identified in 40 C.F.R. §§ 261.20 through 261.24 (1988). The characteristics of hazardous waste are ignitability (40 C.F.R. § 261.21 [1988]), corrosivity (40 C.F.R. § 261.22 [1988]), reactivity (40 C.F.R. § 261.23 [1988]), and toxicity (40 C.F.R. § 261.24 [1988]).

[25] Public Act No. 85-443, § 1, codified at General Statutes (Rev. to 1987) § 22a-452c, defines "spill" as "the discharge, spillage, uncontrolled loss, seepage or filtration of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous waste."

that the metal shavings do not fit into any of the enumerated categories and, therefore, are not covered by the warranty.

Specifically, the defendant relies on the doctrine of ejusdem generis, a rule of construction, to support the claim that the phrase "other environmental contamination" cannot encompass the metal shavings because that phrase is limited by the specifically defined terms preceding it. The defendant concludes that this specific limitation means that environmental contamination is covered only if it is hazardous waste or a hazardous substance. We disagree.

The principle of ejusdem generis applies when "(1) the [clause] contains an enumeration by specific words; (2) the members of the enumeration suggest a specific class; (3) the class is not exhausted by the enumeration; (4) a general reference [supplements] the enumeration . . . and (5) there is [no] clearly manifested intent that the general term be given a broader meaning than the doctrine requires." 2A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 47.18. Thus, "[t]he doctrine of ejusdem generis calls for more than . . . an abstract exercise in semantics and formal logic. It rests on particular insights about everyday language usage. When people list a number of particulars and add a general reference like 'and so forth' they mean to include by use of the general reference not everything else but only others of like kind. The problem is to determine what unmentioned particulars are sufficiently like those mentioned to be made subject to the [clause's] provisions by force of general reference." Id.

The defendant's conclusion, limiting as it does the definition of "other environmental contamination" to hazardous waste and/or hazardous substances, interprets "like kind" to mean "identical kind." This interpretation would render the phrase meaningless in the

context of the warranty. Because parties ordinarily do not insert meaningless provisions in their agreements, "[e]very provision of [a] contract must be given effect if it can reasonably be done." *A. M. Larson Co.* v. *Lawler Ins. Agency, Inc.*, 153 Conn. 618, 621–22, 220 A.2d 32 (1966). Thus, we reject the defendant's definition.

Our reading of paragraph 15 (k), taking into account the rules of construction and the logic of everyday language, supports an interpretation of the catchall phrase "other environmental contamination" as encompassing those contaminants, including solid and special waste, that are subject to regulation by the department. Our reasoning is twofold: (1) the specifically enumerated classes are alike in that they are forms of waste defined and regulated by the department and, thus, classes of like kind to those enumerated would include defined and regulated wastes; and (2) the ordinary everyday meaning of the word "contaminant" encompasses regulated waste such as solid and special waste.[26]

The 1985 revision of § 22a-209-1 of the Regulations of Connecticut State Agencies, in effect at the time of the actions involved here, defined special wastes as "*non-hazardous* solid wastes which require special handling . . . either more or less restrictive than the requirements imposed on a solid waste disposal area." (Emphasis added.) See footnote 9. The regulation further provided that "[t]he term includes . . . *non-hazardous* . . . industrial sludges, liquids, solids or contained gases . . . ." (Emphasis added.) Under this definition, the metal shavings need not exhibit toxicity to be classified as a special waste, but rather need only

---

[26] "The dictionary defines 'contaminant' as 'something that contaminates,' and it defines 'contaminate' as 'to soil, stain, corrupt, or infect by contact or association' or 'to render unfit for use by the introduction of unwholesome or undesirable elements.' Webster's Third New International Dictionary (1986)." *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 772, 653 A.2d 122 (1995).

be an industrial solid. Ultimately, neither party disputes that the shavings are indeed an industrial solid.

The disposal of special waste is regulated by § 22a-209-8 of the Regulations of Connecticut State Agencies, the pertinent provisions of which provide: "Special waste disposal shall comply with the permit and operation and management requirements of solid waste disposal areas with the exceptions and additional special considerations noted in this section. . . . (b) A separate permit to construct or to operate is not required if combined disposal of the waste in question with other solid wastes or special wastes is authorized and the requirements for these special wastes are adequately provided for in the facility plan. (c) The combined disposal of special wastes with other solid wastes or special wastes is prohibited unless specifically approved in writing by the Commissioner. . . . Any such approval shall become part of the facility plan."

The defendant makes much of the fact that the plaintiff did not seek permission from the department to treat the metal shavings as special waste. Our examination of the record, however, reveals no indication that the waste disposal facility to which the excavated material was taken was not approved by the department as a special waste disposal site. More to the point, the shavings' status as special waste is determined by the department's regulatory definition, and not by the plaintiff's actions. Finally, were we to accept the defendant's argument that the shavings are not special waste, there is no credible argument to be made that the shavings are not solid waste, as defined by General Statutes (Rev. to 1987) § 22a-207 (3); see footnote 22; and as such subject to regulation by the department.

The regulation of special waste is part of an elaborate regulatory scheme administered by the department for the management of all solid waste products, whether

residential or commercial, industrial or nonindustrial, hazardous or nonhazardous. This regulatory scheme is set forth in General Statutes (Rev. to 1987) §§ 22a-207 through 22a-251 and by §§ 22a-209-1 through 22a-209-16 of the Regulations of Connecticut State Agencies. In addition to defining "waste," these regulations direct where and in what manner that waste may be disposed, and dictate what types of waste a given disposal facility may accommodate. See Regs., Conn. State Agencies § 22a-209-2 (prohibiting open [nonpermitted]) dumps); § 22a-209-4 (covering permit process for solid waste facilities); § 22a-209-7 (setting forth technical specifications for solid waste facilities); § 22a-209-9 (governing solid waste transfer facilities); § 22a-209-13 (specifying process for closing solid waste facility). Given the scope of the regulatory scheme, and the governmental interest in regulating the disposal of waste, we conclude that the trial court's treatment of the metal shavings, whether characterized as special waste or "merely" solid waste, as falling well within this regulatory scheme, being of like kind to those enumerated and thus covered as "other environmental contamination" by paragraph 15 (k) of the agreement, was not clearly erroneous.

B

The defendant next argues that, even if the metal shavings fall within the purview of paragraph 15 (k), the trial court improperly held the defendant liable for the excavation that took place after November 11, 1988. Specifically, the defendant argues that the excavation of the additional 370 cubic yards between November 11 and November 15, 1988, was not necessary because there were no actionable levels of contaminants present in test samples taken by HRP on November 11, the results of which were not yet known at the time of the excavation. We disagree.

Implicit in the trial court's decision awarding the plaintiff damages covering the November, 1988 excava-

tion is a factual finding that the further excavation was reasonably necessary. "[O]ur role is not to retry the facts." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 16, 662 A.2d 89 (1995). "[W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole . . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992); see also *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 220, 435 A.2d 24 (1980)." (Citations omitted; internal quotation marks omitted.) *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993).

The defendant has conceded that the initial excavation of 1000 cubic yards of contaminated soil was covered by paragraph 15 (k) of the agreement. This concession appears to be based on the fact that the initial testing of the soil revealed the presence of xylenes in excess of listed state action levels.[27] The defendant further concedes that testing performed on November 8, 1988, revealed elevated xylene levels. The defendant argues, however, that because the tests conducted on November 11, 1988, did not reveal any contaminants above state action levels, the excavation that took place before the results of those tests became available was unnecessary and, therefore, the defendant cannot be held liable.

---

[27] See footnote 4.

In effect, the defendant argues that the determination of whether the excavation was necessary depends on whether actionable quantities of hazardous waste or substances or contaminants had been detected by HRP's testing. There is nothing, however, in the language of paragraph 15 (k) of the agreement to indicate that any contaminants must be above state action levels. That paragraph refers to "hazardous substances," "spills" and "hazardous waste" as defined by applicable Connecticut and federal statutes. It also refers to "other environmental contamination." Whether a substance is above or below a state or federal action level does not enter into its definition as hazardous substance, hazardous waste, spill or other environmental contaminant. Rather, it is so designated either because of its chemical composition or its physical properties. See, e.g., 40 C.F.R. § 302.4 (1988) (listing hazardous substances for purposes of Comprehensive Environmental Response, Compensation and Liability Act of 1980); 40 C.F.R. §§ 261.21 through 261.24 (1988) (listing characteristics of hazardous waste for purposes of Resource Conservation and Recovery Act of 1976). We decline to accept the defendant's suggestion that paragraph 15 (k) is triggered only when substances in excess of state action levels are present.

The trial court heard testimony that, on November 8, 1988, HRP investigators noted the presence of metal shavings, discolored soil, and a hydrocarbon odor in the soil being removed. Tests taken that day showed elevated xylene levels. HRP's expert testified that he made the same visual and olfactory observations on November 11 and, on the basis of that evidence, decided to proceed with further excavation, even though the results of tests taken that day were not yet available. Because the November 8 tests indicated elevated xylene levels and the olfactory and visual evidence available to the HRP expert on November 11 was the same as

on November 8, the trial court properly found that it was reasonable for HRP to assume that there would also be elevated xylene levels in the soil samples taken on November 11. Finally, the trial court, having determined that paragraph 15 (k) applies to the metal shavings that were obviously present on November 8 and November 11, acted well within its discretion in finding that the excavation was necessary despite the fact that the November 11 test results did not reveal xylenes above state action levels. See Practice Book § 4061; *Groton* v. *Yankee Gas Services Co.*, supra, 224 Conn. 691.

## II

The defendant's second claim in its cross appeal is that the trial court improperly calculated the damages associated with the 1988 excavations. Specifically, the defendant claims that the court did not take into account a discount that the plaintiff had negotiated with the excavating company, and did not deduct costs associated with a paving upgrade to which the plaintiff has conceded it was not legally entitled.[28]

On February 2, 1989, the plaintiff submitted an invoice to the defendant detailing the cost of the 1988 excavations. Included in those costs was a charge of $35,690 for the excavation itself, as well as an estimated charge of $18,000 for repaving the excavated area.[29] On April 13, 1989, the defendant returned the invoice to the plaintiff, disputing the excavation and paving

[28] In addition, the defendant claims that the costs associated with the repaving were only an estimate and had not been "actually incurred" at the time of trial. The defendant argues that because the indemnity provision covers only those costs "actually incurred," the defendant should not be held liable for the paving costs. We disagree. See part III of this opinion. In the alternative, the defendant argues that it should not be held liable for any pavement upgrades and that it should be credited for the discount negotiated by the plaintiff.

[29] The invoice also included separate charges of $711.99 and $4724.38 for HRP and two separate charges of $270.90 each for American Masons. The parties do not dispute these charges.

charges. The defendant's cover letter explained that because the defendant believed the excavation between November 11 and November 15 was unnecessary, it adjusted the invoice to reflect the deduction of excavation and paving costs associated with that later excavation. The defendant also disputed the actual number of hours billed by the contractor for the total excavation. The defendant's revised costs for excavation and paving were $26,840.90 and $5320, respectively, a difference of $21,529.10. On May 8, 1989, the defendant mailed the plaintiff a check for $38,139.07. The defendant now argues that this payment in fact constituted an overpayment, because it included the cost of processed stone paving to which the plaintiff was not entitled.

Again we are asked to review the trial court's factual determinations. At trial, the court heard testimony regarding the disputed costs and the discounted total excavation cost of $32,936.35, which the plaintiff had negotiated with the excavating contractor but had not passed on to the defendant. The court's memorandum of decision reflects this testimony and includes a downward adjustment in the excavation cost that reflects the discount negotiated by the plaintiff and another downward adjustment in the paving award. We conclude that the trial court's conclusion is adequately supported by the record and, therefore, is not clearly erroneous. See Practice Book § 4061; *Groton* v. *Yankee Gas Services Co.*, supra, 224 Conn. 691.

### III

We next consider the plaintiff's appeal, beginning with the proper construction of paragraph 15 (k) of the agreement. The plaintiff argues that the trial court failed to include in its damages all of the costs associated with the remediation of the environmental contamination at the site.[30] In response, the defendant argues that under

[30] Specifically, the plaintiff argues that: (1) paragraph 15 (k) should be interpreted as separate warranty and indemnity provisions; and (2) even if

paragraph 15 (k): (1) it can be held liable only for costs that actually had been incurred by the plaintiff; (2) the estimated damages in the 1989 report were too speculative for the plaintiff to recover them; and (3) the defendant cannot be held liable for the contamination found in December, 1994, because it was not discovered within the five year indemnity period. We agree with the plaintiff.

## A

The plaintiff argues that the trial court improperly denied recovery of its full measure of damages. In contrast, the defendant claims that it can be held liable only for those costs actually incurred by the plaintiff. We conclude that, under paragraph 15 (k) of the agreement, the plaintiff's damages are not limited to costs actually incurred.

Paragraph 15 (k) provides in relevant part: "Seller shall defend, indemnify and hold Purchaser harmless from and against any liabilities, losses, damages, costs or expenses (including reasonable attorneys' fees) of any nature arising from the environmental condition of or problem with the Property, which condition or problem arose prior to Closing and whether known by

paragraph 15 (k) is construed as only an indemnity provision, the defendant's obligation to indemnify is not limited to costs actually incurred. The plaintiff relies on general principles of contract law to argue that a separate warranty provision exists in paragraph 15 (k) that entitles it to all the damages that reasonably flowed from the defendant's breach, provided the plaintiff had made its claims within six years of the defendant's breach in accordance with General Statutes § 52-576. In connection with the indemnity provision of paragraph 15 (k), the plaintiff claims it is entitled to all the damages it could prove reasonably flowed from the defendant's breach, provided the plaintiff had made its claims within five years of the closing. The defendant, in response, argues that the warranty and indemnity provisions of paragraph 15 (k) are mutually dependent. Because we conclude that the defendant is liable for the plaintiff's full damages regardless of how the two provisions are construed, we need not consider the plaintiff's argument that the paragraph should be construed as constituting separate warranty and indemnity agreements.

Purchaser (by virtue of the Site Assessment Report) or unknown." "Generally, indemnity agreements fall broadly into two classes, those where the contract is to indemnify against liability and those where it is to indemnify against loss. In the first, the cause of action arises as soon as liability is incurred, but in the second it does not arise until the indemnitee has actually incurred the loss. . . . Where an indemnity agreement, however, indemnifies against liability as well as against loss . . . the indemnitee does not have to wait until the loss occurs, but may sue on the agreement as soon as liability is incurred. 41 Am. Jur. 2d, Indemnity § 29." (Citations omitted.) *Balboa Ins. Co.* v. *Zaleski*, 12 Conn. App. 529, 534–35, 532 A.2d 973, cert. denied, 206 Conn. 802, 535 A.2d 1315 (1987); see *Fairfield* v. *D'Addario*, 149 Conn. 358, 361, 179 A.2d 826 (1962) (finding agreement to constitute indemnity against liability, under which obligation to defend arose when action was brought); *Calamita* v. *DePonte*, 122 Conn. 20, 23–24, 187 A. 129 (1936) (ordering new trial where trial court disregarded distinction between indemnity against liability and indemnity against loss); *Morehouse* v. *Employers' Liability Assurance Corp.*, 119 Conn. 416, 423–25, 177 A. 568 (1935) (construing "no action" clause in liability insurance policy to constitute indemnity against loss, not liability).

The defendant argues that it is liable only for the costs actually incurred by the plaintiff. In other words, the defendant claims that its contractual obligation arises only when the plaintiff suffers a loss, rather than mere liability. We disagree. On the issue of whether, in the event of a breach of the contract, the plaintiff's damages would be limited to those actually incurred, this contract presents clear and definitive language that for more than sixty years has been interpreted but one way. The terms in paragraph 15 (k) are unambiguous in their requirement that the defendant will hold the

plaintiff "harmless from and against any *liabilities,* losses, damages, costs or expenses" arising from an environmental condition of the property. (Emphasis added.) Because the indemnity protects against liability in addition to loss, the plaintiff need not wait until an actual loss occurs, but may sue once liability is incurred. *Balboa Ins. Co.* v. *Zaleski,* supra, 12 Conn. App. 535. Accordingly, we conclude as a matter of law; see *Tremaine* v. *Tremaine,* supra, 235 Conn. 57; that the plaintiff's damages are not limited to those costs it actually incurred.

B

The plaintiff further argues that the trial court improperly refused to award damages in the form of estimated future cleanup costs. Specifically, although the trial court did not require the plaintiff to have actually incurred the damages in order to collect them, the plaintiff asserts that the trial court improperly required it to ascertain with reasonable certainty, prior to expiration of the five year indemnity agreement, the amount of its damages. In response, the defendant contends that the trial court was correct in determining that the November, 1990 and November, 1991 cost estimates were merely speculative. The defendant further argues that the trial court properly excluded the costs associated with the December, 1994 testing from the plaintiff's judgment because that contamination was not actually discovered within the five year indemnity period. We agree with the plaintiff.

In its memorandum of decision, the trial court stated: "The court holds that the defendant cannot be held responsible for any contamination made on the assumptions and estimates of HRP in its November, 1990 and 1991 reports. These assumptions and estimates based on limited data and without further testing were merely speculative.

"The court further holds that the defendant cannot be held responsible for any contamination which was discovered in December, 1994. The purchase and sale agreement specifically provides that the indemnity set forth therein shall survive the closing for a period of five years only. The court interprets this to mean that the seller can only be held responsible for contamination that was actually *discovered* within the five year period. While certain contamination was discovered within the five year period, 1370 cubic yards of that soil had been removed and the court finds that the defendant is liable for the costs of that removal. The amount of further contamination expected to be found (prior to the expiration of the five year indemnity period) was based on assumptions, estimates, and speculation, and the plaintiff failed to prove what the amount of that contamination was. The amount of additional contamination actually discovered in December, 1994, was discovered after the five year indemnity period had expired." (Emphasis in original.)

Assuming, without deciding, that the trial court could properly reject the 1990 and 1991 estimates as speculative, we nevertheless disagree with the trial court's determination regarding the 1994 investigation. "It is axiomatic that the burden of proving damages is on the party claiming them. *Gargano* v. *Heyman*, 203 Conn. 616, 620, 525 A.2d 1343 (1987); *Conaway* v. *Prestia*, 191 Conn. 484, 493–94, 464 A.2d 847 (1983); *Dixon* v. *Trubisz*, 17 Conn. App. 216, 217–18, 551 A.2d 1259 (1988). When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. *Simone Corporation* v. *Connecticut Light & Power Co.*, 187 Conn. 487, 495, 446 A.2d 1071 (1982); *Bianco* v. *Floatex, Inc.*, 145 Conn. 523, 525, 144 A.2d 310 (1958). Damages 'are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable

certainty.' *Humphrys* v. *Beach,* 149 Conn. 14, 21, 175 A.2d 363 (1961); *Gargano* v. *Heyman,* supra, 621; *Simone Corporation* v. *Connecticut Light & Power Co.,* supra, 494–95; *Bronson & Townsend Co.* v. *Battistoni,* 167 Conn. 321, 326–27, 355 A.2d 299 (1974); *Anderson* v. *Zweigbaum,* 150 Conn. 478, 482, 191 A.2d 133 (1963)." *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut,* 218 Conn. 474, 476–77, 590 A.2d 431 (1991).

"Although damages often are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier; *Johnson* v. *Flammia,* [169 Conn. 491, 500, 363 A.2d 1048 (1975)]; this situation does not invalidate a damage award as long as the evidence afforded a basis for a reasonable estimate by the [trier] of that amount. *Paiva* v. *Vanech Heights Construction Co.,* 159 Conn. 512, 517, 271 A.2d 69 (1970)." (Internal quotation marks omitted.) *Conaway* v. *Prestia,* supra, 191 Conn. 494. "Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate. . . ." (Citations omitted.) *Falco* v. *James Peter Associates, Inc.,* 165 Conn. 442, 445, 335 A.2d 301 (1973).

It is undisputed that, prior to the expiration of the five year indemnity period, the plaintiff notified the defendant that additional contamination existed at the property and that it would require remediation.[31] The metal shavings and hydrocarbon odor detected in the December, 1994 investigation were, in fact, the same contamination as that already discovered during the indemnity period. Additionally, although the testing for TPH content was performed for the first time in 1994, such testing detects the total content of hydrocarbons

---

[31] Additionally, we note that the plaintiff filed its complaint, alleging breach of indemnity, well within the five year indemnity period.

present, which would include the xylene that had been detected in November, 1988. The additional excavation in 1994 was done to ascertain with some precision the extent of the contamination at the site to enable the plaintiff to prove within a reasonable degree of certainty the amount of the cleanup costs. As HRP's vice president Walter Gancarz testified: "The reason we conducted the December, 1994 investigation was to be able to give the court the clearest summary of cost estimate for remediation of the area of 22–24 Leggett Street."[32] Notwithstanding this testimony, the trial court refused to consider the cost estimates of the December, 1994 investigation because it had not been performed within the five year indemnity period.

We conclude that the trial court improperly required the plaintiff to quantify with reasonable certainty, within the five year indemnity period, the amount of its damages. Although a plaintiff has the evidentiary burden of proving its damages at the time of trial; *Falco* v. *James Peter Associates, Inc.*, supra, 165 Conn. 445; there is no additional requirement that the plaintiff must satisfy this evidentiary burden prior to the expiration of the applicable limitations period.[33] Accordingly, the trial court improperly refused to consider whether the December, 1994 investigation constituted a fair and reasonable estimate of the plaintiff's damages.

## IV

Finally, the plaintiff argues that the trial court improperly declined to award it attorney's fees and costs in

---

[32] We further note that even the defendant's expert characterized the December, 1994 investigation as "thorough" and "comprehensive."

[33] In light of our resolution of this issue, we need not address the plaintiff's fourth claim on appeal that, because the defendant failed to raise the issue of timeliness as a special defense, the trial court improperly considered the defendant's claim that the expiration of the five year indemnity period set forth in the agreement barred certain of the plaintiff's claimed damages. Additionally, we need not address the plaintiff's arguments, raised separately, regarding its claims of negligent and fraudulent misrepresentation.

connection with this litigation pursuant to paragraph 15 (k). We agree.

"The general rule of law known as the 'American rule' is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. See *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U.S. 240, 247, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975); *Fleischmann Distilling Corporation* v. *Maier Brewing Co.*, 386 U.S. 714, 717, 87 S. Ct. 1404, 18 L. Ed. 2d 475 (1967). This rule is generally followed throughout the country. See 20 Am. Jur. 2d, Costs § 72. Connecticut adheres to the American rule. See, e.g., *Brookfield* v. *Candlewood Shores Estates, Inc.*, 201 Conn. 1, 14, 513 A.2d 1218 (1986); *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 140, 475 A.2d 305 (1984); *Gionfriddo* v. *Avis Rent A Car System, Inc.*, 192 Conn. 280, 297, 472 A.2d 306 (1984); *Litton Industries Credit Corporation* v. *Catanuto*, 175 Conn. 69, 75, 394 A.2d 191 (1978); *Central New Haven Development Corporation* v. *Potpourri, Inc.*, 39 Conn. Sup. 132, 134, 471 A.2d 681 (1983)." *Marsh, Day & Calhoun* v. *Solomon*, 204 Conn. 639, 652, 529 A.2d 702 (1987). There are few exceptions. For example, where a specific contractual term provides for the recovery of attorney's fees and costs; see, e.g., *Storm Associates, Inc.* v. *Baumgold*, 186 Conn. 237, 245, 440 A.2d 306 (1982); or where a statute controls. See, e.g., General Statutes § 52-240a (attorney's fees may be awarded in products liability action). Additionally, an indemnitee is entitled to recover from an indemnitor, as part of its damages, attorney's fees, costs and expenses. 41 Am. Jur. 2d, Indemnity § 48 (1995); *Sendroff* v. *Food Mart of Connecticut, Inc.*, 34 Conn. Sup. 624, 626, 381 A.2d 565 (1977); see *Calamita* v. *DePonte*, supra, 122 Conn. 27 (stating indemnitee is entitled to recover not only sum

actually agreed to be paid, but also reasonable expenses incurred).

Here, paragraph 15 (k) expressly provides for the recovery of attorney's fees and costs.[34] Specifically, that paragraph provides: "Seller shall defend, indemnify and hold Purchaser harmless from and against any liabilities, losses, damages, *costs or expenses (including reasonable attorneys' fees) of any nature* arising from the environmental condition of or problem with the Property . . . ." (Emphasis added.) The defendant's opposition to the award of attorney's fees and costs is based upon its many arguments that the plaintiff is not entitled to any money other than what had already been paid by the defendant prior to the commencement of this action. Having rejected those arguments, we see no reason why, in accordance with the express and unambiguous contractual provision, the plaintiff should not receive compensation for the costs and reasonable attorney's fees it incurred in prosecuting its claim against the defendant.

The judgment is affirmed insofar as it ordered judgment in favor of the plaintiff on liability; insofar as the trial court misapplied the law of damages, the judgment is reversed and the case is remanded to the court with direction to hold a new trial limited to the plaintiff's damages, including attorney's fees and costs, consistent with this opinion.

In this opinion the other justices concurred.

---

[34] Given the defendant's position that paragraph 15 (k) is a unified provision, the plaintiff's breach of warranty claim encompasses the remedies available under the indemnity language of that paragraph, including attorney's fees and costs.