[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The following decision constitutes the findings of fact and conclusions of law of this court based upon the relevant, CT Page 3078 credible and admissible evidence in connection with a retrial upon remand of the foregoing case as delineated in 42 Conn. App. 426
(1996). The remand order was for further proceedings to determine whether the city had breached the parking agreement and, if so, the damages to which if any the plaintiffs are entitled. In addition, as enunciated by that court at page 438, because the prior trial court did not decide whether the defendants had breached the implied covenant of good faith and fair dealing, the court on remand was instructed to address that claim also. Thus, the foregoing constituted the two issues upon which the parties were heard at trial.
The plaintiffs commenced this action on April 15, 1992. Their amended complaint contained other claims than those upon which this trial was heard. The matter was originally tried in September 1994. Judgment was rendered in favor of the defendants on each count asserted against them. The plaintiffs appealed to the Appellate Court which reversed the judgment in part and remanded it for further proceedings.
On or about May 4, 1959 the City approved a "Redevelopment Plan" which required it to provide multi-level parking facilities in the Center Street Redevelopment Project. This the City did, and entered into an agreement between the City and the Redeveloper dated October 9, 1963, Exhibit 1 at this trial hereinafter referred to as "The Parking Agreement". This redeveloper had entered into a lease with Sears, Roebuck Co., August 1, 1963, which was, until it vacated the premises during the dispute herein, for its own reasons, the principal tenant in the Riverview Center, a name by which the plaintiffs' premises are commonly known.
The Sears' lease specifically provided that the Redeveloper would provide "a parking area for no less than 600 cars to be constructed and maintained in the said shopping center and that the tenants and customers shall at all times during the term hereof have the right to park in said area without any charge for first hour of such parking." The Sears store opened for business and the lease term commenced on April 19, 1965 under an initial lease term of 25 years with the option of renewing for two separate and consecutive periods of five years each after the expiration of the original term of the lease. The Parking Agreement was entered into by the City and the Developer on October 9, 1963 and pursuant to its the City agreed to provide "multi-level parking facilities to accommodate not less than 600 cars referred to in the Sears lease as parking arcade. The prior owners of the premises, the original CT Page 3079 parties to these agreements and leases conveyed the premises to the plaintiffs herein, Middletown Commercial Associates Limited Partnership in June 1994.
All of the parties have made the various payments due under the lease and agreement. In August 1990 the State of Connecticut, Department of Public Works issued a request for proposals for the construction of a new courthouse in Middletown. Konover Associates, Inc. and others submitted proposals. It was the anticipation of the parties who submitted said proposals that a portion of the premises, upon which the parking arcade was located, were to be utilized in connection with the construction of the courthouse. The Konover people, closely associated and or identical to the plaintiffs, herein submitted a proposal, as aforementioned, which was not accepted by the State.
A contract was awarded for the construction of the courthouse and by notification in March, 1992, the city gave notice to the plaintiffs herein that the City intended to close the parking facility for a period of three months, commencing on April 15, 1992, to facilitate the demolition of a portion of the facility. The entire arcade was closed for demolition from May 4, 1992 to June 2, 1992 at which time the lower level of the arcade was reopened. On or about October 5, 1993 the entire arcade was reopened with the number of parking spaces reduced to approximately 381.
The plaintiffs herein transferred ownership of their interest in Riverview Center in June 1994.
The document under scrutiny herein upon which the plaintiffs must rely in order to recover for breach of contract is the arcade agreement entered into on October 9, 1963 between the City and the then developer, River Valley, which provided in part that "the redeveloper shall have at its option, the exclusive privilege of providing for its tenants, subtenants and their customers the privilege of parking for the first hour at no charge to the customer but at a charge to the Redeveloper in accordance with the payments schedule set forth in the agreement. The payment schedule guaranteed it an annual payment by the Redeveloper to the City of $9,000 for one the hour free parking option. For any amount over 150,000 hours of parking, the payments would increase according to the schedule. The parking agreement was to become effective upon the official opening of Sears which was the anchor tenant and was to expire 35 years thereafter. The parking arcade was constructed CT Page 3080 and opened in 1965. The maximum number of parking spaces numbered somewhere between 550 and 565. It is undisputed and the court finds that the City has always maintained, in the parking arcade, a public parking facility and has leased out on a monthly basis most if not all the spaces contained in the lower level. The ability of the City to lease spaces or issue permits was unlimited.
The construction of the courthouse was awarded to the Turner Construction Co. and demolition of the northerly portion of the parking arcade was scheduled to begin on May 1, 1992. Thereafter the construction of the new courthouse and its adjacent parking garage was to begin.
The plaintiffs started an action at law against the defendant alleging among other things that the City and the parking authority breached the parking agreement with the plaintiffs who were alleged to be successors in interest to River Valley, and had breached the easement that the plaintiffs claimed was created thereby. Their request for temporary injunction, after an evidentiary hearing, was denied by the court. One of the notable findings of the court in that matter was that "on an average day, 100 spaces are empty on the upper level of the parking arcade and 80 spaces are vacant on the lower level."
Following the court's denial of the injunction, the city closed down the parking arcade for approximately three to four weeks in May 1992 and then after from June 2, 1992 until October 6, 1993 there were 195 parking spaces available in the parking arcade. Many of the monthly parkers were relocated during this period of time to the Middlesex Mutual Insurance Company's parking garage. On October 6, 1993 the upper level of the parking arcade was reopened with the number of spaces reduced to its present total of approximately 365 spaces.
The Appellate Court agreed with the prior trial court that the parking agreement did not provide for exclusive use of the arcade by the plaintiffs, their tenants and customers, but rather required "that the City make available to the plaintiffs a reasonable number of spaces consistent with their needs."Middletown Commercial Associates Ltd. Partnership v. Middletown,42 Conn. App. 426, 438.
Because of the prior determination by the Appellate Court the remand trial court may only consider "whether the parking garage had a sufficient number of spaces pursuant to the agreement and CT Page 3081 not whether such parking was available elsewhere. This court restricts its findings herein as directed by the Appellate Court.
Neither the plaintiff nor the defendant have ever conducted a actual traffic survey of the parking arcade either prior to or subsequent to its closing and reopening. The most credible evidence presented to the court was the testimony of Mr. Kuehn, the present and or former Development Director for the City of Middletown that he parked in the arcade daily subsequent to its reopening. He never observed that the lower level, where he actually parked, daily was more than 50% occupied and his observations daily of the upper level indicated that it was "sparsely" utilized.
It is truly significant, as noted by the Appellate Court, that under any construction of the parking agreement it is an inescapable conclusion that the plaintiffs' and/or their tenants at the Riverview Center were never entitled to the exclusive use of this parking arcade facility. The area was subject to substantial and varying numbers of permits, yearly licenses and monthly rental of spaces which existed all through the period in question herein. Even with that permit — license utilization, this court concludes that the parking area was never more than 50% utilized. Thus, one half of the 365 spaces always remained available and unused and were potentially available to the customers and tenants of the plaintiffs and their various business enterprises located at the Riverview Center.
The only viable claim that the plaintiffs present is that the permanent reduction in the physical number of parking spaces in the arcade constituted a breach of the parking agreement. This court concludes from the evidence that the plaintiffs were not denied a reasonable number of parking spaces to meet their needs subsequent to the demolition and permanent reduction of the number of parking spaces. A critical time frame prior to the plaintiffs' transfer of interest in the premises was May of 1992 to June of 1994. The court's findings and conclusions apply to that period as well as to any subsequent period that might be claimed and it is found that the City always provided a reasonable number of spaces consistent with the needs of the tenants during the appropriate periods of time. This court was presented with insufficient evidence for it to conclude that the automobile traffic into the garage and the parking arcade, the number of parking validations, the number of tenants and their particular parking requirements were not being reasonably met under the parking contract with the Defendant City CT Page 3082 of Middletown. This court concerns itself with the actuality of the situation and does not base its opinion upon alleged hypothetical parking needs testified to by various witnesses for the plaintiff based on sorts of etherial standards of "ideal situations".
Since the plaintiff herein did not have the exclusive right to use of the parking arcade, it seemed incumbent upon this court to consider the actual needs of the plaintiff and their tenants as demonstrated by the evidence and thus the court in considering those finds that the City has met its obligations under the parking agreement.
The plaintiffs claim a breach of contract by virtue of the temporary closure of the parking arcade during demolition for a period of two or three weeks. The Appellate Court was aware of this and made no comment on it on remand. This court considers that the temporary closure for a period of a few weeks was a matter of passing insignificance and that alternative parking was provided and available during said period of time for the customers of the plaintiffs. In view of the development of the courthouse project, such closing was indeed necessary for the protection of the public. This court concludes that said temporary closing does not constitute a breach of contract upon which the plaintiff can base' a claim for relief hereunder.
Parenthetically, if this court were to have determined that a breach occurred, the plaintiffs provided this court with insufficient evidence as to its damages resulting from the breach. "It is axiomatic that the burden of damages is on the party claiming them . . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." (Citations omitted.) 24 Leggett StreetLtd. Partnership v. Beacon Industries, Inc., 239 Conn. 284, 308
(1996). Absent sufficient proof by the plaintiffs of damages to a reasonable certainty, this court, if a breach had been found, would not have awarded damages to the plaintiffs.
Finally, the plaintiffs claim that the city is liable for a breach of the implied covenant of good faith and fair dealing. It is well settled that a covenant of good faith and fair dealing is implied in every contract. Magnan v. Anaconda Industries, Inc.,193 Conn. 558, 566 (1984). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectation of the other CT Page 3083 party . . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." Id., 566-567.
This court concludes that the parking agreement placed upon the City the obligation of providing the plaintiffs with a reasonable number of spaces to meet their actual needs and consequently this is the only reasonable expectation that the plaintiffs could have had. The court's prior findings in connection with the performance of the City under the parking agreement being that the City did fulfill it contractual obligation, the claim of the plaintiffs herein for breach of the implied covenant of good faith and fair dealing is without merit.
The allegations of the complaint remaining subject to the action of this court on remand are dismissed and judgment is entered in favor of the defendants herein. Costs are awarded to the defendant.
It is so ordered.
HIGGINS, J.