JOHN BARBER III ET AL. *v.* SKIP BARBER
RACING SCHOOL, LLC
(AC 27684)

Bishop, McLachlan and Hennessy, Js.

60

Argued October 16, 2007—officially released February 26, 2008

*James K. Robertson, Jr.*, with whom, on the brief, was *Thomas J. Sansone*, for the appellant-appellee (plaintiff Lime Rock Associates, LLC).

*Michael P. Shea*, with whom was *Steven M. Greenspan*, for the appellee-appellant (defendant).

*Opinion*

BISHOP, J. The plaintiffs, John "Skip" Barber III and Lime Rock Associates, LLC (associates), commenced this action against the defendant, the Skip Barber Racing School, LLC (new school),[1] due to a series of business disputes. The associates appeal from the trial court's judgment, claiming that the court (1) improperly found that the existing usage agreement between the parties controls a subsequently constructed autocross course and (2) miscalculated the amount of compensation owed to the associates for the new school's use of the B paddock.[2] In its cross appeal, the new school claims that the court (1) failed to apply the proper standard of proof for an alleged breach of fiduciary duty by Barber and (2) misinterpreted the variable pricing formula of the parties' usage agreement. With regard to the associates' appeal, we affirm both the court's determination that the use of the autocross course is controlled by the existing usage agreement and the court's calculation of the B paddock compensation. As to the new school's cross appeal, we reverse the judgment of the court on the counterclaim alleging breach of fiduciary duty, and we affirm the court's judgment interpreting the usage agreement's variable pricing formula.

The following general facts are set forth in the court's memorandum of decision. Barber is a former professional race car driver who established an auto racing school (old school) at Lime Rock Park (racing park) in Lakeville in 1975. The racing park property contains a 1.53 mile paved auto racing track and its supporting

---

[1] The new school sought and obtained permission to implead the Skip and Judith Barber Charitable Remainder Unitrust as a third party defendant. The third party defendant is not party to this appeal.

[2] The B paddock is an area of the associates' race track property adjacent to the maintenance building that consists of a series of paved roads separated by grass.

areas and buildings. The old school and the racing park had an oral agreement as to which areas of the racing park property the old school could use for its operations, the school's schedule of use and compensation for this usage. After commencing the racing school operations at the track, the old school added a defensive driving component and a racing series for former students, and it expanded its program to tracks throughout the United States and Canada.

In 1983, the associates purchased the racing park. By the early 1990s, Barber was the majority stockholder of the associates, thereby simultaneously controlling both the race track and the old school. In the spring of 1999, Barber sold 80 percent of his stock in the old school to the investor, Sports Capital, LLC, while remaining the school's chief executive officer. The stock purchase agreement between Barber and Sports Capital, LLC, required that the associates and the old school negotiate a written agreement for the old school's continued use of the racing park. Sports Capital, LLC, insisted on the agreement to ensure that its investment, the old school, would have continued, reliable access to the track and would be protected from excessive rate increases by the associates. The result was a fifteen year usage agreement signed by Barber in his capacity as the chief executive officer of both the associates and the old school. The usage agreement provided guaranteed price protections, a 50 percent discount on use of the track and upper area, and scheduling and use assurances for the track facilities.

The old school suffered severe financial distress during its ownership by Sports Capital, LLC. In December, 2001, the old school's assets were purchased by the new school, pursuant to a written asset purchase agreement. During the transaction, the language and terms of the usage agreement were not altered or amended. According to § 6.01 (*l*) of the asset purchase agreement,

the rights and obligations of the old school under the fifteen year usage agreement were assigned to the new school.

The parties' relationship began to disintegrate over conflicting interpretations of the usage agreement, disagreements over compensation and mutual distrust. The plaintiffs filed a complaint against the new school on March 27, 2003, alleging that the new school owed the plaintiffs money for the new school's use of the track and for their obligations under the asset purchase agreement. The new school filed counterclaims on June 18, 2003, alleging that Barber had breached his fiduciary duty and seeking clarification by the court of the terms of the usage agreement.

After a court trial that lasted nine days, incorporation into the record of a two day evidentiary hearing on competing motions for a prejudgment remedy, a site visit by the court in the company of the parties' attorneys and extensive posttrial briefs, the court issued a memorandum of decision. Consequently, both parties filed motions to reargue. In response, the court issued a memorandum of decision rectifying mistakes in the court's initial calculation of damages. This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

APPEAL BY THE ASSOCIATES

A

First, the associates claim that the court improperly rendered judgment declaring that the second autocross course is controlled by the preexisting usage agreement that was negotiated between the associates and the old school. Specifically, the associates claim that the court improperly concluded that the usage agreement controls the subsequently constructed second autocross

course on the basis that the second autocross course is a related facility to the upper area, and, therefore, the associates cannot charge additional compensation for its use.

The following supplementary facts are relevant to resolution of the associates' claim. In March, 1999, when the usage agreement was signed, the track property contained only one autocross course. Section 2.1 of the usage agreement provides that the old school "shall have the right to use the Track, the Upper Area and their associated garages, parking areas and related facilities . . . ." The upper area is shown on a map included as exhibit D of the usage agreement. The upper area consists of the Skip Barber racing pad and a roughly rectangular area that, though the map is not drawn to scale, incontrovertibly includes the entire original autocross course.

On July 15, 1999, the board of directors (board) of the old school, at the request of Barber, the school's president and chief executive officer, approved a capital expenditure of $242,000 for the construction of a second autocross course as a leasehold improvement. Barber, who was also the controlling shareholder of the associates at the time, told the board that by billing the second autocross course as a one year leasehold improvement, the old school would save approximately $143,000 over the alternative of reimbursing the associates' construction costs through a five year lease. The minutes further indicate that Barber had experience arranging similar leasehold improvements at other tracks and that Barber informed the board that a second autocross course was useful only to the old school and actually detracted from the associates' property.

The second autocross course was constructed in late 1999, and two paved roads linked it to the first autocross, allowing expansion of the two courses into one

larger track. The old school used the second autocross course in its operations, without charge, until its assets were sold to the new school in December, 2001. The new school continued to use the second autocross course, without charge, through the 2002 racing season. In a memo dated March 14, 2003, however, the associates explained that the new school was not using the second autocross course for free but was paying for it through charges of $1250 per day of use applied against a credit of $242,000[3] that was earned when the old school funded the construction of the second autocross course in 1999. According to the associates, these credits were exhausted in April, 2004; thereafter, the new school was required to pay rent.

The fundamental issue in the parties' disagreement over the second autocross course is whether the second autocross course is covered by the usage agreement or whether it is outside the preexisting usage agreement and thereby subject to additional charges. The court rendered judgment declaring that the use of the second autocross course is subject to the terms of the usage agreement because it is a related facility to the upper area. In its memorandum of decision, the court stated: "Although [the usage agreement map of the upper area] is not drawn to scale, it is my estimation, from my site visit, that the second autocross course is built at least partially within this rectangle. It is also clear to me that the second autocross course is a 'related facility' to the first autocross course. It is connected to the first autocross course by short paved roads so that cars can use both courses together as one. A declaratory judgment shall enter that the second autocross is a related facility to the Upper Area and its use is subject to the terms of the Usage Agreement in all respects."

[3] The language of the footnote in the March 14, 2003 memo states that the credit amount was $200,000, but the court's memorandum of decision and the minutes of the board of directors meeting at which the second autocross project was approved indicate a total payment of $242,000.

The standard of review for the interpretation of a contract is well established. "When a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." (Citation omitted; internal quotation marks omitted.) *David M. Somers & Associates, P.C.* v. *Busch*, 283 Conn. 396, 402–403, 927 A.2d 832 (2007). Whether contractual language is ambiguous is a question of law and is subject to plenary review. *LMK Enterprises, Inc.* v. *Sun Oil Co.*, 86 Conn. App. 302, 306, 860 A.2d 1229 (2004).

"When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *David M. Somers & Associates, P.C.* v. *Busch*, supra, 283 Conn. 403.

The associates specifically claim that the court's conclusion that the second autocross is covered by the usage agreement is illogical and wholly unsupported by the evidence. First, the associates argue that because

the second autocross course did not exist at the time the usage agreement was signed and because the usage agreement is silent as to the use of future facilities, it was not the intent of the parties that the usage agreement control new facilities like the second autocross course. The associates contend that the court's finding that the second autocross course is a related facility to the upper area tortures the plain meaning of the language of the usage agreement and ignores the testimony of the associates' general manager that "[i]t's incredible to think that by simply putting two little teeny connector roads between two separate pieces of property that they automatically become one . . . . There are roadways all over the place that connect point A to point B. That doesn't necessarily mean that that makes it part of a racetrack or a driving school area." The associates argue that even if deference is given to the court's estimation that the second autocross course is partially within the designated upper area, it logically follows that some of it is not, and, therefore, the second autocross course is not a related facility and is outside the scope of the usage agreement. Finally, the associates argue that the evidence reveals that the second autocross course was constructed and used primarily for separate, unrelated use by different organizations, and, therefore, the court's finding was clearly erroneous. We are not persuaded.

We agree with the court that the scope of the phrase, "shall have the right to use the Track, the Upper Area and their associated garages, parking areas and related facilities," as used in § 2.1 of the usage agreement, is ambiguous. Accordingly, we review the court's findings to determine if they are clearly erroneous.

The court's conclusion that the second autocross course is a related facility to the upper area is based in part on the court's finding that the second autocross course is at least partially within the upper area. This

finding is based primarily on the court's site visit to the track. It has long been held that "a court has discretion to permit the fact-finder, be it court or jury, to view the premises or a location relevant to the trial. . . . Evidence obtained from views is substantive evidence and can independently support a factual finding." (Citations omitted.) C. Tait, Connecticut Evidence (3d Ed. 2001) § 11.9.1, p. 805; see also *Abington, LLC* v. *Avon*, 101 Conn. App. 709, 715 n.5, 922 A.2d 1148 (2007). None of the evidence showed and none of the witnesses claimed that the paving that was done when the second autocross course was constructed was completely outside of the space designated as the upper area. In light of the fact that the maps attached to the usage agreement clearly state "not to scale" and the map used at trial to indicate the location of the second autocross course does not have a scale, the court's reliance on its site visit to determine that the second autocross course was at least partially within the upper area is sufficient evidence to support the court's conclusion and is not clearly erroneous.

In addition to its finding as to the geographic relationship of the second autocross course with the upper area, the court found that the second autocross course was sufficiently associated with the upper area for it to be deemed a related facility to the upper area under the usage agreement. In arriving at this conclusion, the court was persuaded by the existence of paved roads connecting the two autocross courses and allowing them to be used as one course. Though the evidence indicates that use of the larger autocross course as one facility is infrequent, it is still sufficient to support the court's finding that the second autocross course is a related facility to the upper area.

Finally, the court noted the lack of substantial evidence supporting the associates' contention that the second autocross course was intended to exist outside

of the usage agreement. In particular, the board's minutes make no reference to the specific credit arrangement that the associates claim was approved, the usage agreement was not amended to reflect the second autocross course, the old school used the second autocross course without charge, the new school was not informed that future payments would accrue for its use of the second autocross course when it purchased the old school, and the new school used the second autocross course without charge until 2003. The court discredited the March, 2003 memo, in which the associates describe the claimed credit arrangement, on the basis that it disingenuously coincided with both the new school's failure to pay its other bills and the time when the associates began to rent the second autocross course separately to a go-karting organization.

Although the record may reveal inconsistent evidence on this issue, "[i]t is the trier's exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." (Internal quotation marks omitted.) *Lusa* v. *Grunberg*, 101 Conn. App. 739, 758, 923 A.2d 795 (2007). We conclude that the evidence is sufficient to support the court's conclusion that the second autocross course is a related facility to the upper area and is controlled by the terms of the fifteen year usage agreement. The court's finding was not clearly erroneous.

## B

The associates next claim that the court's finding that there was insufficient evidence of the new school's compensable use of the B paddock beyond the evidence presented at the prejudgment remedy hearing was improper. "[T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal

quotation marks omitted.) *Duplissie* v. *Devino,* 96 Conn. App. 673, 699, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006).

The following facts are relevant to the disposition of this issue. Generally, the B paddock is used to organize and then to transport different groups of cars out to the track and for overflow parking of race cars and trailers. In addition, the new school occasionally uses the B paddock for driving school activities and exercises. The B paddock is not mentioned by name in the usage agreement; the court found, however, that the B paddock is a "parking area" as provided for in § 2.1. Consequently, the court rendered judgment declaring that "the new school is only entitled to use the B paddock for overflow parking incidental to the track and upper area. Any other use of the B paddock requires the permission of associates and the payment of a fee at retail price."

Initially, the court found that the record lacked sufficient evidence to prove the number of days that the new school used the B paddock for driving school exercises beyond incidental overflow parking, but in response to the associates' motion to reargue or for clarification, the court amended its findings. The court stated: "The plaintiffs are correct that the court mistakenly failed to consider all of the evidence submitted in support of the claim that the new school has used the B paddock for driving school exercises and activities beyond incidental parking. Specifically, the court mistakenly failed to consider testimony at the prejudgment remedy hearing as to the specific number of days of such use. The testimony and exhibits at the prejudgment remedy hearing were, by stipulation, made a part of the record in the trial of this case." The court ordered the new school to pay the retail price of $1500 per day for conducting driving exercises on the B paddock on forty-six days in 2002 and on thirty-four days in 2003, in accordance

with evidence presented at the prejudgment remedy hearing. The court found that "[t]he evidence was insufficient to prove any additional claims of use" beyond what was presented at the prejudgment remedy hearing.

The associates claim that the court's finding of damages is improper because the evidence presented at trial, supplemented by the evidence from the prejudgment remedy hearing, proves that the new school used the B paddock for driving exercises on a total of forty-six days in 2002, fifty-two days in 2003 and paid only half of the full retail price for fourteen days of use in 2004. The associates claim they are entitled to payment for an additional eighteen days in 2003 and the remaining payment for 2004. We disagree.

At the prejudgment remedy hearing on November 3, 2003, the associates claimed that the new school used the B paddock to conduct driving exercises on forty-six days in 2002 and thirty-four days in 2003. Barber testified at the hearing confirming these numbers but indicating that the tally only went through September, 2003. The parties stipulated that the testimony and exhibits from the prejudgment remedy hearing would be incorporated into the record. At trial, the associates introduced a chart listing claimed underpayments by the new school, intending to update the evidence incorporated into the record from the prejudgment remedy hearing.[4] The numbers in this chart reiterate the new school's use of the B paddock on forty-six days in 2002, increase the claimed usage in 2003 by eighteen days to

[4] At trial, two compilations were admitted within two days of each other. The second compilation corrected several errors identified by the new school. Both documents were identical regarding the B paddock claims. The new school's brief to this court indicates a discrepancy between days claimed in the two documents. The foundation for this argument is puzzling, however, as the new school relies on a version of the compilation, included in the appendix of its brief, that was not an exhibit at trial, has a date different from any of the similar compilations that were exhibits at trial and is marked "draft."

a total of fifty-two days and add fourteen days for 2004. The chart also indicates that the new school paid half of each of the fourteen invoices for 2004. The charts for the years 2002 and 2003 have an explanatory asterisk next to the B paddock category: "Items or amounts owed per the terms of the Usage Agreement; invoices not found." The associates explained that the asterisk indicates that these numbers are not compilations of invoices issued, but rather, compilations of claims taken from track records, as there are no invoices for the new school's use of the B paddock in 2002 and 2003. Apparently, when the relationship was going well, the associates chose not to bill the new school for its use of the B paddock; once the relationship started to deteriorate, however, the associates tallied all of the new school's usage information and began to issue invoices. The court admitted the chart as a full exhibit over the new school's objection to all of the asterisked items because they lacked invoices.

The court found that the evidence presented at the prejudgment remedy hearing proved, by a preponderance of the evidence, the new school's use of the B paddock but declined to award further damages. Specifically, in response to the associates' motion to reargue or for clarification, the court expressly stated that there was insufficient evidence to merit further damages beyond the evidence provided in the prejudgment remedy hearing. "This court does not retry the case or evaluate the credibility of the witnesses. . . . This court cannot substitute its own judgment for that of the [trial court] if there is sufficient evidence to support the [trial court's judgment]." (Citation omitted; internal quotation marks omitted.) *DAP Financial Management Co.* v. *Mor-Fam Electric, Inc.*, 59 Conn. App. 92, 98–99, 755 A.2d 925 (2000). Accordingly, we affirm the court's judgment in this regard.

## II

## CROSS APPEAL BY THE NEW SCHOOL

### A

The new school cross appeals from the court's judgment rejecting its claim that Barber breached his fiduciary duty. Specifically, the new school claims that the court should have required Barber to prove fair dealing by a clear and convincing standard of proof. We agree with the new school.

The following additional facts are relevant to resolution of this issue. In November, 1994, Chrysler Corporation (Chrysler) entered into a written sponsorship agreement with the old school, under which Chrysler agreed to provide Dodge vehicles, engines and yearly monetary payments in exchange for the old school's promotion of Dodge products. On the same day, Chrysler also entered into a written sponsorship agreement with the associates, under which Chrysler agreed to provide the associates with Dodge vehicles in exchange for the associates' promotion of Dodge products. It is undisputed that Barber caused a check for $42,500 to be sent to the associates every quarter out of the payment the old school received from Chrysler. The records reflect that $170,000 was transferred annually from the old school to the associates in this manner until the new school's purchase of the old school in the fourth quarter of 2001. Under the terms of the asset purchase agreement, the new school assumed the old school's rights and obligations under the Chrysler sponsorship agreement.[5]

---

[5] At trial, the associates claimed that the new school owed it a total of $552,500 for just over three years of unpaid Chrysler sponsorship payments that had accrued since the new school purchased the old school and ceased making the payments. The court found that the new school was not obligated to continue the payments, as there was no reference to this alleged $170,000 annual obligation in either the written Chrysler sponsorship agreement or the asset purchase agreement.

The associates assert that the quarterly payments were part of the original sponsorship agreement between Chrysler and the associates. The associates contend that Chrysler refused to enter into agreements with both the old school and the associates unless Chrysler could pay the sponsorship moneys by writing only one check per quarter. In order to appease Chrysler and to secure both agreements, Barber, as the chief executive officer of the old school and the controlling shareholder of the associates during the period at issue, caused the old school to send a quarterly payment for $42,500 to the associates.

In its amended counterclaim of January 14, 2004, the new school claimed that Barber breached his fiduciary duty to the old school by causing the annual transfer of $170,000 from the old school to the associates.[6] The new school alleged that in negotiating the sponsorship contracts, Barber, as the fiduciary for the old school, had a direct conflict of interest and was engaged in self-dealing. As part of this claim, the new school sought reimbursement for the sponsorship moneys that were transferred to the associates from the old school's Chrysler sponsorship agreement payments. In its memorandum of decision, the court rejected the claim that Barber breached his fiduciary duty, finding that the payments were "perfectly proper" because there was a legitimate oral agreement between the old school and the associates to compensate the associates $170,000 annually. In reaching this decision, the court did not state the standard of proof it applied to this claim. On appeal, the new school claims that the court failed to

[6] Despite not owning an interest in the old school's assets during the alleged breach, the new school asserts that under the asset purchase agreement, it acquired the right to bring actions that could have been asserted prior to the signing of the asset purchase agreement. This issue of the new school's right to bring this action was not contested by the associates on appeal, and, therefore, it is waived.

apply the appropriate standard of proof in its conclusion that Barber did not breach his fiduciary duty.[7] We agree.

"When a party contests the burden of proof applied by the court, the standard of review is de novo because the matter is a question of law." (Internal quotation marks omitted.) *Wieselman* v. *Hoeniger*, 103 Conn. App. 591, 595–96, 930 A.2d 768, cert. denied, 284 Conn. 930, 934 A.2d 245 (2007). "Our law on the obligations of a fiduciary is well settled. [A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him. . . . Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence. . . . Such burden shifting occurs in cases involving claims of fraud, self-dealing or conflict of interest." (Citation omitted; internal quotation marks omitted.) *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 302–303, 900 A.2d 560 (2006).

---

[7] The new school also claims that the court's stated finding in its memorandum of decision that an oral agreement existed between the old school and the associates concerning the Chrysler sponsorship payment of $170,000 is clearly erroneous. The new school claims that the court's finding is outside the boundaries of the pleadings, as neither party alleged that the agreement in question existed between the old school and the associates. Furthermore, the new school refers to a statement made at trial by counsel for the associates, which specifically rejects the court's misunderstanding about the oral argument and clarifies that the agreement was between Barber and Chrysler. As we are remanding the case for a rehearing to apply the proper standard of proof, we need not reach this issue.

"A fiduciary seeking to profit by a transaction with the one who confided in him has the burden of showing that he has not taken advantage of his influence or knowledge and that the arrangement is fair and conscientious." *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 457, 844 A.2d 836 (2004). "[W]here there is a transaction, contract, or transfer between persons in a confidential or fiduciary relationship, and where the dominant party is the beneficiary of the transaction, contract, or transfer . . . the burden shifts to the fiduciary to prove fair dealing." (Internal quotation marks omitted.) *Heaven* v. *Timber Hill, LLC*, supra, 303–304.

It is undisputed that Barber owed a fiduciary duty to the old school to abide by the terms of the Chrysler sponsorship contract. It is also undisputed that Barber was the controlling shareholder of the associates at that time and that the associates benefited from the $170,000 annual transfer. The new school's counterclaim plainly alleged a conflict of interest and self-dealing in Barber's causing the $170,000 annual transfer from the old school to the associates. Consequently, once evidence was admitted regarding Barber's dual and conflicting positions of trust, the court should have shifted the burden to Barber to prove fair dealing by clear and convincing evidence. The court did not articulate the standard of proof it applied to this claim. When the court's memorandum of decision fails to state the applicable standard of proof, "we assume that the usual civil preponderance of the evidence standard was used." (Internal quotation marks omitted.) Id., 302; see also *Tessitore* v. *Tessitore*, 31 Conn. App. 40, 43, 623 A.2d 496 (1993). We, therefore, must remand this portion of the case to the trial court for further proceedings in accordance with the more exacting clear and convincing standard of proof.

### B

The new school cross appeals from the court's judgment declaring the procedure for application of the

variable pricing formula of the usage agreement for fees for the track and upper area. Specifically, the new school claims that the correct reading of § 4.2, applying each sentence in its literal sequence, requires that the 50 percent discount attaches after the market comparison price protector sets the average price that the new school is charged by other comparable tracks. We are not persuaded.

The following additional facts are relevant to resolution of this issue. Under exhibit E of the usage agreement, titled "Track and Upper Area Fees. Track Retail Prices," the prices for use of the track and upper area are fixed for the years 1999, 2000 and 2001. Additionally, exhibit E states: "The retail price for the Upper Area is $1,200 per day. Except for Barber Race Weekends, [the old school] pays ½ of the Track and Upper Area retail prices." There were no disputes over the prices charged by the associates until 2001. The usage agreement provides that, after 2001, the prices for the track and upper area are to be calculated in accordance with the procedures outlined in § 4.2. Section 4.2 provides in relevant part: "All prices paid by [the old school][8] to [the associates] shall be as set forth in this Agreement and shall be fixed for a period of one (1) year after the date hereof, provided that the fees for the Track set forth in Exhibit E shall be fixed until December 31, 2001. After a price ceases to be fixed hereunder, it shall increase . . . (b) for the Track or the Upper Area no more than once each year by an amount so that such price is competitive with both (i) the amount charged therefor by other comparable tracks to Barber, and (ii) the amounts charged by [the associates] therefor to other customers of [the associates]. The fifty percent (50%) discount specified in

---

[8] The usage agreement uses the name Barber to reference the old school. When the new school purchased the old school, it assumed all the rights and obligations of the old school under the asset purchase agreement.

Exhibit E shall apply to rates for the Track and Upper Area for the period after the fixed period identified in Exhibit E. The prices charged by [the associates] to [the old school] shall be the lowest prices charged by [the associates] to any customer of [the associates] for use of the Track and/or the Upper Area, other than for bona fide charitable events and promotional, marketing and introductory or demonstration events not competitive with the business of [the old school]."

The court found that § 4.2 establishes the price for the new school in the following manner: first, the associates establish the retail price for all users; then, the retail price is reduced by 50 percent, as provided in exhibit E, for weekday use; finally, that amount, the 50 percent of the retail price, is evaluated to see if it violates any of the four price protectors. The court summarized the price protectors in four questions: (1) Has the price charged to the new school been increased more than once in any given year? (2) Is the price charged to the new school competitive with the amounts charged to the new school by comparable tracks? (3) Is the price charged to the new school competitive with the amounts charged by the associates to other customers of the track? and (4) Is the price charged to the new school the lowest price charged by the associates to any customer for use of the track, other than for bona fide charitable events and promotional, marketing or demonstration events not competitive with the business of the new school?

The new school disagrees with the court's reading of § 4.2, arguing that the proper interpretation of § 4.2 requires that the price be established by following the sequence of the sentences: under the new school's proposed analysis, the average price the new school is charged by comparable tracks would be the retail price; then, the new school would pay 50 percent of that average price. This analysis ties the retail price the

associates charge for all customers at the track to the average price the new school is charged by comparable tracks. We are not persuaded.

The new school does not dispute the court's finding that, to the extent necessary to resolve this issue, the contract language of § 4.2 is not ambiguous. It is well settled that when the contract language is clear and unambiguous, the determination of the intent of the parties' agreement is a question of law over which our review is plenary. *Bristol* v. *Ocean State Job Lot Stores of Connecticut*, 284 Conn. 1, 7, 931 A.2d 837 (2007).

In interpreting contract language, "[t]he intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Citation omitted; internal quotation marks omitted.) *Trugreen Landcare, LLC* v. *Elm City Development & Construction Services, LLC*, 101 Conn. App. 11, 14, 919 A.2d 1077 (2007).

Having established that the contract language at issue here is unambiguous, we agree with the court's finding

that the common vocabulary used throughout § 4.2 drives the interpretation of this section and produces the most reasonable and equitable result. Section 4.2 uses the words price and rate to differentiate between the actual amount billed to the new school and the retail price charged to all users of the track. Section 4.2 begins, "All *prices* paid by [the old school] to [the associates]"; (emphasis added); thereby establishing that the word price is defined as the actual amount billed. The second sentence begins, "After a *price* ceases to be fixed hereunder, it shall increase . . . no more than once each year by an amount so that such *price* is competitive . . . ." (Emphasis added.) This sentence reinforces the conclusion that the word price refers to the actual amount billed to the new school. Finally, in the last sentence of this section, the word price is used two more times to indicate an additional price check that is to be conducted before the final price is billed to the new school. This language establishes that the price protectors are to be applied at the end of the price setting process, just before the bill is sent to the new school. In contrast, the word rate is used to identify the retail price charged by the associates to all of its other customers. According to exhibit E, the new school is to be charged 50 percent of this retail price. The final billing price will remain at 50 percent of the retail price unless it violates one of the price protectors. Admittedly, the sentences in § 4.2 are not applied in their transcribed sequential order; however, a sequential application would torture the plain meaning of the vocabulary.

Additionally, we agree with the court that the new school's proposed interpretation of § 4.2 would render exhibit E meaningless. The new school's proposition that it is to be charged 50 percent of the average price the new school is charged by other comparable tracks directly conflicts with exhibit E, which provides a 50

percent discount on the retail price.[9] "The law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous." *United Illuminating Co.* v. *Wisvest-Connecticut, LLC,* 259 Conn. 665, 674, 791 A.2d 546 (2002). The more reasoned and appropriate interpretation of § 4.2, as established by the court, provides that the new school is billed 50 percent of the retail prices charged by the associates to all customers, as long as the amount does not surpass the price protectors.

On cross appeal, the judgment is reversed only as to the defendant's claim of breach of fiduciary duty and the case is remanded to the trial court for further proceedings consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[9] The new school argues that nothing in the usage agreement binds the associates to charge all customers of the track the same retail price and that the associates could create a grossly inflated retail price just for the new school. Although the new school is correct that there is no such language in the usage agreement, by implication the retail price is the price the associates charge to all of its other customers. Furthermore, the new school's fear is unsubstantiated. The retail prices fixed under the usage agreement for the years 1999-2001 were in fact the same prices that were charged other customers. There is no evidence that the new school is planning on creating a two tiered set of retail prices in the future.