******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## KIM MAGSIG *v.* MICHAEL MAGSIG
## (AC 39544)

DiPentima, C. J., and Prescott and Bozzuto, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dissolved, appealed to this court from the trial court's denial of her postjudgment motion for contempt, in which she claimed that the defendant had breached the terms of parties' separation agreement that made the defendant responsible for certain debt to W Co. and required that the plaintiff be held harmless for that debt. Specifically, she claimed that the defendant had not made the required payments to W Co. for approximately one year and had not notified her of any significant developments or discussions regarding this debt, namely, that he intentionally had defaulted on the loan. As a result, the plaintiff claimed that she suffered losses, including diminished creditworthiness. The defendant maintained that because W Co. had not commenced any proceedings regarding that debt, his obligation to hold the plaintiff harmless had not yet been triggered. The trial court denied the plaintiff's motion for contempt on the ground that the plaintiff failed to prove, by clear and convincing evidence, that the defendant wilfully and intentionally had violated the separation agreement, reasoning that the agreement did not require the plaintiff to be indemnified for any collateral damages that may be caused directly or indirectly by the nonpayment of the W Co. debt. *Held*:

1. The plaintiff's claim that, because the agreement was unambiguous, the trial court improperly considered evidence outside of the four corners of the contract in determining the parties' intent with respect to the indemnification language of the agreement was unavailing; the defendant's testimony regarding his understanding of what triggered his obligation to indemnify the plaintiff was admitted for the purpose of determining whether he had wilfully violated the agreement and the court did not use that evidence to interpret the parties' intent with respect to the agreement, as the mere fact that the court permitted the defendant to testify about his understanding of the agreement did not mean, a fortiori, that the court used that testimony to interpret the parties' separation agreement, particularly where the court specifically identified the basis of its conclusion in its memorandum of decision and noted that the defendant's testimony was admitted for the purpose of determining whether he had violated the agreement wilfully.

2. The plaintiff could not prevail on her claim that because similar language used in the agreement has been interpreted in other cases as an indemnity against liability and not simply loss, she was not required to wait until she sustained an actual loss to bring a successful motion for contempt: although the indemnification clause provided that the defendant would hold the plaintiff harmless from "any loss, injury, debt, charge, legal fees, or liability" with respect to the debt to W Co., the agreement further required that the defendant secure his indemnification obligation with particular assets and notify the plaintiff of any and all material, significant developments regarding that debt, and those provisions would have been rendered useless and unnecessary under the plaintiff's interpretation of the agreement, under which she already would have been entitled to full and immediate recourse on the indemnification provision on the day of the dissolution judgment; accordingly, the trial court properly concluded that the defendant's indemnity obligation was not triggered until W Co. commenced an action against the plaintiff or otherwise took affirmative steps to collect from her with respect to the debt.

Argued February 13—officially released July 3, 2018

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, and tried to the court, *Hon. Stanley Novack*, judge trial referee; judgment dissolving

the marriage and granting certain other relief in accordance with the parties' separation agreement; thereafter, the court, *Colin, J.*, denied the plaintiff's motion for contempt, and the plaintiff appealed to this court. *Affirmed.*

*Meredith C. Braxton*, for the appellant (plaintiff).

*Edward M. Kweskin*, with whom, on the brief, was *Sarah E. Gleason*, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiff, Kim Magsig,[1] appeals from the denial of her postdissolution motion for contempt. On appeal, she claims that the trial court improperly concluded that the defendant, Michael Magsig, had not violated an indemnification obligation contained in the parties' separation agreement. We disagree and, accordingly, affirm the judgment of the trial court.[2]

The record reveals the following relevant facts and procedural history. On April 16, 2013, the court, *Hon. Stanley Novack*, judge trial referee, dissolved the marriage of the parties. In accordance with General Statutes § 46b-66, the judgment of dissolution incorporated by reference the parties' separation agreement (agreement). Article 9 of the agreement addressed past and future debts of the parties.

Section 9.2 of the agreement provided: "*The* [*defendant*] *shall be solely responsible for the Wells Fargo Bank debt* (formerly the home equity line of credit on the parties' foreclosed Greenwich property) as a support obligation *and shall indemnify and hold the* [*plaintiff*] *harmless from any loss, injury, debt, charge, legal fees, or liability whatsoever with respect thereto*. The [plaintiff] shall secure this indemnification obligation with his Schwab IRA and Korn Ferry 401 (K) and provide the [plaintiff] semiannually with a statement for each account so long as he shall have this indemnification obligation. The [defendant] shall notify the [plaintiff] of any and all material, significant developments or discussions that take place between him and his representatives and Wells Fargo or its representatives. The [defendant] shall promptly notify the [plaintiff] in the event he learns that Wells Fargo is about to commence an action or seek a lien on the [plaintiff's] real property. In the alternative, if the [defendant] is able to remove the [plaintiff's] name as a joint and severally liable obligor on the promissory note to Wells Fargo, which shall be no later than November 16, 2018, the time of the expiration of the statute of limitations on the Wells Fargo liability, all obligations to the [plaintiff] to hold her harmless from liability from Wells Fargo shall terminate." (Emphasis added.)

On January 23, 2014, the plaintiff filed a motion for contempt pursuant to Practice Book § 25-27, alleging that the defendant had violated § 9.2 of the agreement. Specifically, she claimed that the defendant had not made the "required, regular payments to [the Wells Fargo debt] for approximately one year" and had not notified her of "any and all material, significant developments or discussions" regarding this debt; namely, that he intentionally had defaulted on the loan, resulting in an immediate debt of $434,958.

The plaintiff further alleged that the defendant had agreed to indemnify her for both loss and liability and

that, under Connecticut law, she became entitled to indemnification as soon as the defendant caused her to be liable to Wells Fargo for the entire balance due. Additionally, she claimed injury in that, as a result of the defendant's actions, (1) her credit score had "dropped precipitously"; and (2) she would not be able to remove him from the mortgage note for a South Carolina property as required by the terms of the agreement. Finally, the plaintiff requested attorney's fees pursuant to § 11.3 of the agreement.[3]

The defendant filed an objection to the plaintiff's contempt motion, disputing her claims. Specifically, he argued that because Wells Fargo had not commenced a legal action to enforce its right on the debt, his indemnification obligation had not been triggered. He further claimed that the agreement did not require him to make any payments at any particular time to Wells Fargo. The defendant also maintained that he had secured his indemnity obligation as required by the agreement and had not learned of any material, significant developments regarding the debt, nor had he had any discussions with Wells Fargo. Finally, the defendant requested attorney's fees incurred in responding to the plaintiff's motion and on the basis of "litigation misconduct."

On September 4, 2015, the plaintiff filed a reply in further support of her motion. She iterated that, under Connecticut law, she was entitled to prosecute this motion at the time her liability was incurred and was not required to wait for an actual loss. She also claimed that relevant principles of contract interpretation supported her position.

The court, *Colin, J.*, conducted hearings on May 18, May 19, and May 20, 2016.[4] An employee of Wells Fargo, the plaintiff and the defendant testified, and, following the presentation of evidence, the court heard argument from counsel. On May 23, 2016, the court issued a memorandum of decision denying the plaintiff's motion for contempt. The court concluded that the plaintiff failed to prove, by clear and convincing evidence, that the defendant wilfully and intentionally had violated § 9.2 of the agreement.

Specifically, the court found that the plaintiff had not produced sufficient evidence that she had suffered any loss, injury, debt, charge, legal fees or liability as to the Wells Fargo debt since the date of the dissolution of the marriage. The court also found that although prior to judgment, the real property that originally secured the Wells Fargo debt had been foreclosed and the debt was in default status, Wells Fargo had not taken any "formal collection actions against the parties."

The court noted that the plaintiff had produced evidence that "due to a derogatory reference on her credit report regarding the Wells Fargo debt, she was unable to secure a rental property for herself and therefore

must continue to live in the more expensive South Carolina property . . . . The court finds that this claim is not a 'loss' or 'injury' . . . with respect [to the Wells Fargo debt] contemplated by the parties' agreement." Put another way, the court determined that this type of impact was "collateral damage" and was not within the scope of the indemnification clause.[5]

The court also examined the language of § 9.2 of the agreement and concluded that the defendant's indemnification obligation was triggered when the plaintiff suffered an actual loss, injury, debt, charge, legal fees, or liability directly related to the Wells Fargo debt; in other words, when Wells Fargo "actually makes a claim against the plaintiff or otherwise takes an affirmative step against the plaintiff to collect the funds due. That has not happened, and it may not happen." The court reached this conclusion by considering the entire language of § 9.2; that is, the requirement that the defendant keep the plaintiff informed of material and significant developments and discussions regarding the debt, his obligation to notify her if he learned that Wells Fargo was about to commence an action or seek a lien on her property and the reference to the 2018 statute of limitations regarding the Well Fargo debt. The court also noted that the parties had agreed that § 9.2 did not require the defendant to pay Wells Fargo on time each month. Simply stated, the court determined that "[t]he agreement does not provide that the plaintiff shall be indemnified for any collateral damages that may be caused directly or indirectly by the nonpayment of the Wells Fargo debt, such as the impact on the plaintiff's credit rating or her ability to rent a dwelling or obtain a car loan . . . ."

Next, the court concluded that the relevant language of § 9.2 of the agreement was clear and unambiguous. Then, it explained the flaw in the plaintiff's interpretation of the indemnification clause. "Under the plaintiff's theory of the case, once liability attached to her, the defendant's indemnification obligation is triggered and she is entitled to compensation. The plaintiff's liability in connection with this joint [Wells Fargo] debt attached before the date of the dissolution degree, when the parties signed the note and borrowed the money. Thus, under her theory, the defendant's indemnification obligation arguably was triggered immediately upon the dissolution court's approval and entry of the decree. If that is the case, then the other portions of [§] 9.2 would likely be rendered useless. For example, why would the defendant need to secure his obligation with anything if he was already required to fulfill the indemnification obligation and pay off the debt? If the defendant was already required to fulfill the indemnification obligation, then why would he need to notify the plaintiff of any future collection actions taken by the lender? These provisions would be unnecessary under the plaintiff's present argument since the plaintiff would already have

been entitled to full and immediate recourse on the indemnification provision on the day of the dissolution court's entry of judgment. The court rejects this interpretation of the agreement because it is inconsistent with the parties' intent . . . . The plaintiff has failed to prove that, since the date of the dissolution of the marriage, she has suffered 'any loss, injury, debt, charge, legal fees, or liability . . . with respect to [the Wells Fargo Bank debt]' within the meaning of [§] 9.2 of the parties' agreement. The plaintiff is now attempting to read into the parties' agreement a payment obligation by the defendant that is not contained in the language of the document."

The court further determined that the plaintiff had not incurred a new postdissolution liability and that she was liable for the Wells Fargo debt at the time of the dissolution judgment. Therefore, it concluded "the parties did not intend that this preexisting liability would be used as the basis for an action, postjudgment, under the indemnification from liability provision of [§] 9.2 *without there being any additional affirmative actions being taken by the lender*." (Emphasis added.) Accordingly, the court denied the plaintiff's motion for contempt and her requests for "nearly $500,000 plus counsel fees . . . ."[6] This appeal followed.

As an initial step, we set forth the relevant legal principles and applicable standards of review. "Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . . A contempt judgment cannot stand when, inter alia, the order a contemnor is held to have violated is vague and indefinite, or when the contemnor, through no fault of his own, was unable to obey the court's order." (Internal quotation marks omitted.) *Gabriel* v. *Gabriel*, 324 Conn. 324, 330, 152 A.3d 1230 (2016); see also *Malpeso* v. *Malpeso*, 165 Conn. App. 151, 181–82, 138 A.3d 1069 (2016).

"First, we must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review. . . . Second, if we conclude that the underlying court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding. . . . A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [party] were in contempt of a court order. . . . In domestic relations cases, [a] judgment rendered in accordance with . . . a stipulation of the parties is to

be regarded and construed as a contract. . . . Accordingly, our resolution of the plaintiff's claim is guided by the general principles governing the construction of contracts." (Citation omitted; internal quotation marks omitted.) *Mettler* v. *Mettler*, 165 Conn. App. 829, 835–36, 140 A.3d 370 (2016); see also *Gabriel* v. *Gabriel*, supra, 324 Conn. 330–31; *Dowd* v. *Dowd*, 96 Conn. App. 75, 79, 899 A.2d 76, cert. denied, 280 Conn. 907, 907 A.2d 89 (2006).

"When construing a contract, we seek to determine the intent of the parties from the language used interpreted *in the light of the situation of the parties and the circumstances connected with the transaction.* . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law." (Emphasis in original; internal quotation marks omitted.) *Dejana* v. *Dejana*, 176 Conn. App. 104, 114, 168 A.3d 595, cert. denied, 327 Conn. 977, 174 A.3d 195 (2017); see also *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 191–92, 112 A.3d 144 (2015); *Schimenti* v. *Schimenti*, 181 Conn. App. 385, 396–97,      A.3d      (2018).

In the present case, the plaintiff's appellate argument rests on two foundations. First, she contends that because the language of § 9.2 is unambiguous[7] and the agreement contains a merger clause in § 11.4[8] resulting in an integrated contract, the court was prohibited from considering anything except the language contained in the agreement.[9] Essentially, she claims that the court improperly heard and used parol evidence, namely, the defendant's testimony regarding his understanding when his indemnification obligation was triggered, to interpret § 9.2. Second, she argues that the language used in § 9.2 of the agreement should be interpreted as indemnity against liability, and, therefore, she was not required to wait until a loss occurred to initiate and prevail on her motion for contempt. See *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 306, 685 A.2d 305 (1996); see also *Amoco Oil Co.* v. *Liberty Auto & Electric Co.*, 262 Conn. 142, 148, 810 A.2d 259 (2002); *Balboa Ins. Co.* v. *Zaleski*, 12 Conn. App. 529, 534–35, 532 A.2d 973, cert. denied, 206 Conn. 802, 535 A.2d 1315 (1987). We consider each argument in turn.

First, we consider the plaintiff's argument that the

court improperly considered evidence outside of the four corners of the contract in determining the parties' intent with respect to § 9.2 of the agreement. The parties and the court agreed that § 9.2 was unambiguous. Additionally, the plaintiff contends that, due to the use of a merger clause in § 11.4, the agreement was completely integrated. For these reasons, the plaintiff maintains that it was improper for the court to use parol evidence to determine the parties' intent with respect to § 9.2.

The court did admit into evidence the defendant's testimony regarding his understanding of what triggered his indemnification obligation to the plaintiff. This evidence, however, was admitted for the purpose of determining whether the defendant had wilfully violated § 9.2 of the agreement. After a review of the record and the court's decision, we are persuaded that the court did not use this evidence to interpret the parties' intent with respect to § 9.2.

The following additional facts are necessary for our discussion. During direct examination the defendant stated that he had not taken any action with respect to making payments to Wells Fargo. He testified that he chose not to act after consulting with a foreclosure attorney. The court interjected as follows: "It seems like now everybody agreed—everybody agrees that [the defendant] didn't have to do anything in connection with the bank. The question is what does he have to pay or what does he have to do in connection to his former wife?" The defendant's counsel agreed with the court's statement and suggested that the remaining question was when the defendant's indemnity obligation was triggered.

The defendant's counsel then sought permission to question the defendant regarding his understanding of what would activate his obligation to indemnify the plaintiff. The purpose of this testimony was to determine if the defendant had wilfully violated the parties' agreement. The court permitted the following question from the defendant's counsel to the defendant: "So what is your understanding about when this indemnity is triggered, sir?" The defendant responded that he believed that the indemnification clause was triggered if Wells Fargo notified the defendant or his representatives that it intended to take action on the debt, such as filing a lawsuit or referring the matter to a collection agency. Thereafter, the court inquired: "So is it your understanding, sir, that if Wells Fargo never comes after [the plaintiff] ever for this loan, then your indemnification obligation never gets triggered?" The defendant responded in the affirmative.

On appeal the plaintiff argues that the court first should have construed § 9.2 of the agreement according to its plain language and then determined whether the defendant had wilfully violated its terms. "Instead, the court admitted parol evidence to determine [the] defen-

dant's wilfulness but then used it to interpret the indemnification provision based on [the] defendant's intent
. . . ."

Contrary to the plaintiff's claims, the court did not use the defendant's testimony to determine the parties' intent with respect to § 9.2 of the agreement. As explicitly stated in its memorandum of decision, the court relied on "the other provisions in [§] 9.2, including (a) the defendant's obligation to keep the plaintiff informed of any 'material, significant developments or discussions between him and his representatives and Wells Fargo or its representatives'; (b) the defendant's obligation to notify the plaintiff 'in the event he learns that Wells Fargo is about to commence an action or seek a lien on the [plaintiff's] real property'; and (c) the reference to the expiration of the statute of limitation in 2018 on the Wells Fargo liability, at which time 'all obligations to the [plaintiff] to hold her harmless from liability from Wells Fargo shall terminate.' "

The mere fact that the court permitted the defendant to testify about his understanding of § 9.2 does not mean, a fortiori, that the court used that testimony to interpret the parties' separation agreement. This is particularly true given that the court (1) specifically noted that the defendant's testimony was admitted for the purpose of determining whether he had violated the agreement wilfully, and (2) specifically identified the basis of its conclusion in a memorandum of decision. This court will presume that the trial court acted properly in the performance of its duties. See *Zenon* v. *Mossy*, 114 Conn. App. 734, 737, 970 A.2d 814 (2009). Finally, we note that the plaintiff's appellate argument that the court improperly used the testimony regarding the defendant's understanding of § 9.2 to interpret that part of the agreement amounts to nothing more than conjecture and speculation, which have no place in appellate review. *Konefal* v. *Konefal*, 107 Conn. App. 354, 360, 945 A.2d 484, cert. denied, 288 Conn. 902, 952 A.2d 810 (2008). For these reasons, we disagree that the court improperly used the defendant's testimony to interpret the intent of § 9.2 of the parties' agreement.

Next, we consider the plaintiff's argument that the court misinterpreted § 9.2 of the agreement. Specifically, she contends that the language used in § 9.2 has been interpreted as indemnity against liability in other cases, and therefore she was not required to wait until a loss to bring a successful motion for contempt. We disagree.

The plaintiff relies primarily on *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 239 Conn. 284, and *Balboa Ins. Co.* v. *Zaleski*, supra, 12 Conn. App. 529, in support of this argument. In the former, the defendant contracted to "defend, indemnify and hold the plaintiff harmless from and against any liabilities, losses, damages, costs or expenses (including

reasonable attorneys' fees) of any nature arising from the environmental conditions of or problems with the Property [that the plaintiff had purchased from the defendant], which conditions or problems arose prior to Closing and whether known . . . or unknown." (Internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 288.

In that case, our Supreme Court then set forth the relevant legal principles regarding indemnification clauses. "Generally, indemnity agreements fall broadly into two classes, those where the contract is to indemnify against liability and those where it is to indemnify against loss. In the first, the cause of action arises as soon as liability is incurred, but in the second it does not arise until the indemnitee has actually incurred the loss. . . . Where an indemnity agreement, however, indemnifies against liability as well as against loss . . . the indemnitee does not have to wait until the loss occurs, but may sue on the agreement as soon as liability is incurred." (Internal quotation marks omitted.) Id., 306; see also *Fairfield* v. *D'Addario*, 149 Conn. 358, 361, 179 A.2d 826 (1961).

The court then rejected the defendant's claim that it was liable only for the costs actually incurred by the plaintiff, that is, its obligation was limited to a loss suffered by the plaintiff rather than liability. *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 239 Conn. 306. "On the issue of whether, in the event of a breach of the contract, the plaintiff's damages would be limited to those actually incurred, this contract presents clear and definitive language that for more than sixty years has been interpreted but one way. The terms . . . are unambiguous in their requirement that the defendant will hold the plaintiff harmless from and against any liabilities, losses, damages, costs or expenses arising from an environmental condition of the property. . . . Because the indemnity protects against liability in addition to loss, the plaintiff need not wait until an actual loss occurs, but may sue once liability is incurred. . . . Accordingly, we conclude as a matter of law . . . that the plaintiff's damages are not limited to those costs it actually incurred." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 306–307. This court reached the same conclusion with respect to similar contract language in *Balboa Ins. Co.* v. *Zaleski*, supra, 12 Conn. App. 535–36.

The plaintiff argues that the indemnification language used in § 9.2 of the agreement is similar to that used in *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 239 Conn. 287–88, and *Balboa Ins. Co.* v. *Zaleski*, supra, 12 Conn. App. 535–36, and, accordingly, must be interpreted as requiring the defendant to indemnify her from liability and not simply loss. This argument, however, ignores the other language used by the parties in § 9.2. The indemnification clause provided

that the defendant would hold the plaintiff harmless from "any loss, injury, debt, charge, legal fees, or liability" with respect to the Wells Fargo debt. It also obligated the defendant to "secure this indemnification obligation with his Schwab IRA and Korn Ferry 401 (K) and provide the [plaintiff] semiannually with a statement for each account so long as he shall have this indemnification obligation." Section 9.2 further required the defendant to notify the plaintiff of "any and all material, significant developments or discussions" between himself and his representatives and Wells Fargo and its representatives. The defendant also was obligated to notify the plaintiff if Wells Fargo was "about to commence an action or seek a lien on the [plaintiff's] real property."

The trial court properly concluded that these provisions would be rendered useless and unnecessary under the plaintiff's interpretation of § 9.2. "The law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous." (Internal quotation marks omitted.) *Barber* v. *Skip Barber Racing School, LLC*, 106 Conn. App. 59, 81, 940 A.2d 878 (2008); see also *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 239 Conn. 298 (because parties ordinarily do not insert meaningless provisions into agreements, every provision of contract must be given effect if it can be done reasonably); *Snydergeneral Corp.* v. *Lee Parcel 6 Associates Ltd. Partnership*, 43 Conn. App. 32, 36, 681 A.2d 1008 (1996) (same); *Plikus* v. *Connecticut Light & Power Co.*, 42 Conn. App. 299, 303, 679 A.2d 401 (1996) (same).

Significantly, the court found that the parties were liable for the entire Wells Fargo debt prior to the dissolution judgment incorporating the agreement of the parties.[10] As aptly stated by the trial court, other obligations of the defendant set forth in § 9.2 would be unnecessary because, under the plaintiff's interpretation, she "would already have been entitled to full and immediate recourse on the indemnification provision on the day of the dissolution court's entry of judgment." There would be no need for the defendant to notify the plaintiff of future collection actions or to secure his obligation with his retirement accounts under her interpretation of § 9.2.

We conclude, therefore, that the court's interpretation of § 9.2 of the agreement was not improper given the court's obligation "to determine the intention of the parties from the language used interpreted *in the light of the situation of the parties and the circumstances connected with the transaction*." (Emphasis added.) *Kronholm* v. *Kronholm*, 16 Conn. App. 124, 130, 547 A.2d 61 (1988); see also *Eckert* v. *Eckert*, 285 Conn. 687, 692, 941 A.2d 301 (2008). Under these facts and circumstances, where the debt was incurred and the entire amount was due prior to the dissolution judgment

and their agreement, and in light of the language used in § 9.2, we agree with the trial court that the defendant's indemnity obligation is not triggered until Wells Fargo commences an action against the plaintiff or otherwise takes an affirmative step to collect from the plaintiff with respect to the debt. Accordingly, the plaintiff's claim that the court misinterpreted § 9.2 must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The judgment of dissolution restored the plaintiff's name to Kim Carney.

[2] In the proceedings before the trial court, the plaintiff sought attorney's fees pursuant to §§ 9.2 and 11.3 of the parties' separation agreement. The trial court denied her motion for contempt and her request for attorney's fees. On appeal, the plaintiff argued that if we reverse the judgment of the trial court, then, pursuant to the terms of the separation agreement, the defendant should be ordered to pay her trial and appellate attorney's fees. As a result of our conclusion that the judgment of the trial court should be affirmed, we need not address the plaintiff's claim regarding attorney's fees.

[3] Section 11.3 of the agreement provided: "In the event a party is found to have breached this [a]greement, or to be in contempt of any of the provisions of this [a]greement, that Party shall be responsible for the reasonable legal fees and costs associated with the enforcement of this [a]greement."

[4] Prior to the hearings on the contempt motion, the plaintiff filed a motion in limine, pursuant to Practice Book § 15-3, to preclude the testimony of attorneys Judith Ellenthal and Jill Bicks, who previously had represented the plaintiff and the defendant respectively. The plaintiff also joined Ellenthal's motion to quash the subpoena filed by the defendant. The plaintiff argued that the defendant sought to question Ellenthal and Bicks regarding the negotiation of the terms of the agreement and that such parol evidence was irrelevant and inadmissible where the terms of the agreement were unambiguous.

On April 22, 2016, the court held a hearing on the motion in limine and the motion to quash. After hearing from the parties, the court issued an oral ruling granting the plaintiff's motion in limine as follows: "Extrinsic evidence of the intent of the parties shall be inadmissible to vary or contradict the language of the separation agreement unless the trial court determines that parol evidence will be permitted." The court denied the motion to quash.

[5] The court also determined that the plaintiff had failed to meet her burden of proving that her credit score changed from the date of the dissolution to the present date. It noted that the parties' failure to pay the Wells Fargo debt prior to the dissolution of the marriage and the loss of the collateral, through foreclosure, likely caused the decline in her credit score, rather than the postdissolution events.

[6] The court also denied the defendant's request for attorney's fees.

[7] "A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) *Dejana* v. *Dejana*, supra, 176 Conn. App. 115.

[8] Section 11.4 of the agreement provided: "The [defendant] and the [plaintiff] have incorporated in this [a]greement their entire understanding, and no oral statement or prior written matter extrinsic to this [a]greement. The parties agree that each is not relying upon any representations other than those expressly set forth herein."

[9] "[T]he parol evidence rule is not an exclusionary rule of evidence . . . but a rule of substantive contract law . . . . The rule is premised upon the

idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages . . . in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. . . . Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement. . . .

"The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant . . . to prove [inter alia] a collateral oral agreement which does not vary the terms of the writing . . . ." (Citations omitted; internal quotation marks omitted.) *Weiss* v. *Smulders*, 313 Conn. 227, 248–49, 96 A.3d 1175 (2014); see also *Perricone* v. *Perricone*, 292 Conn. 187, 194, 972 A.2d 666 (2009).

[10] This factual finding is supported by the testimony of Stephen Miller, an employee of Wells Fargo, who stated that the relevant account has been in default status since January, 2013.

———————————————